Colleen Duffy-Smith, State Bar No. 161163
Morgan Duffy-Smith & Tidalgo LLP
1960 The Alameda, #220
San Jose CA 95126
(408) 244-4570

*E-filing*

FILED Paid
NP
2010 JUN 25 A 10: 24
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CAL. SAN JOSE

[Additional counsel on
signature page]

*ADR*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE DIVISION)

| | |
|---|---|
| RITZ CAMERA & IMAGE, LLC a Delaware Limited Liability Company, On Behalf of Itself and Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>SANDISK CORPORATION, ELIYAHOU HARARI,<br><br>Defendants. | CASE: **C V 10- 02787** HRL<br><br>**RELATED CASES: C 04-4379-JF, C 05-5021 JF, C 05-4691 JF, C 08-2332 JF**<br><br>**COMPLAINT**<br>**CLASS ACTION**<br>**ANTITRUST**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT - Page 1

This matter is related to *SanDisk Corp. v. STMicroelectronics, Inc. et al.,* Case No. 5:04-cv-4379 (Fogel, J.), and other cases that have been consolidated with that case. *See* proposed Administrative Motion to Consider Whether Cases Should Be Related (draft copy affixed as Appendix A hereto).

On behalf of itself and other similarly-situated direct purchasers of flash memory products from the SanDisk Corporation ("SanDisk") and from manufacturing joint ventures controlled by SanDisk, Ritz Camera & Image, LLC ("RCI") alleges as follows:

## SUMMARY OF CLAIMS

1.      Flash memory chips and cards (collectively "cards" or "flash memory") are used to store digital information for mobile phones, digital cameras, digital video camcorders, gaming devices, portable digital audio/video players, personal computers, and global positioning systems ("GPS").

2.      SanDisk has controlled the worldwide production of flash memory cards by obtaining fraudulent patents ("fraudulent patents") by committing willful and knowing fraud on the United States Patent and Trademark Office ("USPTO"). It has used those fraudulent patents to monopolize the relevant market for flash memory by asserting infringement of those patents against competitors and their customers.

3.      SanDisk has acted to monopolize the relevant market for flash memory in part by entering into joint venture, license, and other agreements with Toshiba Corporation to produce flash memory marketed by SanDisk and Toshiba through manufacturing joint ventures.

COMPLAINT - Page 2

4. Also in aid of its monopolization, SanDisk – in concert with Eliyahou Harari, a former officer of competitor Wafer Scale Integration, Inc. ("WSI") – has tortiously converted the ownership of other flash memory patents ("converted patents") from WSI (and its successor STMicroelectronics ("STM")). At the same time as – or subsequent to – some of this unlawful conduct Harari became the founder of SanDisk and is the current Chairman and Chief Executive Officer of SanDisk.

5. As a consequence, SanDisk controls over 75% of all flash memory cards sold worldwide (and, in the alternative, over 98% of all high-density flash memory chips, flash drives, or cards), through sale, joint ventures, and licensing agreements with licensees.

6. SanDisk has used this control to monopolize the relevant market for flash memory products made with flash memory as their primary or only input, and as a consequence have charged above-competitive, monopoly prices to Plaintiff and other direct purchasers of these flash memory products.

7. Such SanDisk flash memory sold to members of the proposed Class include in part:

- flash memory cards for digital cameras, camcorders;

- USB external memory drives, and personal computer memory sticks;

- flash memory cards for digital storage in mobile telephones;

- flash memory cards for digital media players, allowing purchasers to download and store music and video; and

COMPLAINT - Page 3

- flash memory cards for personal computer and enterprise server storage.

8.    Further, SanDisk has threatened members of the proposed Class against purchasing flash memory from SanDisk's competitors, including STM, which contain technology covered by SanDisk's fraudulent and converted patents. SanDisk has told direct purchasers that they will be left holding large quantities of unusable flash memory manufactured by those that refuse to license SanDisk's fraudulent or converted technology. SanDisk has also warned these businessess that they will be made to purchase flash memory products at disadvantageous prices and terms if they are later forced to turn to SanDisk for product.

9.    SanDisk manufactures the vast majority of its flash memory cards using at least three fabrication joint ventures with Toshiba, which produce the memory at Toshiba's Yokkaichi factory in Japan. SanDisk terms these Toshiba cards as "captive supply."

10.    By virtue of this monopolization, worldwide purchasers of flash memory products from SanDisk and joint ventures controlled by SanDisk ("Class of Direct Purchasers of SanDisk Flash Memory Products") have paid above-competitive, monopoly prices for these products since June 25, 2006.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question), as this action arises under Section 2 of

COMPLAINT - Page 4

the Sherman Act (15 U.S.C. § 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

12.     Venue is proper because SanDisk resides within this judicial district as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## PARTIES

13.     Plaintiff RCI is a Delaware limited liability company headquartered in Beltsville, Maryland. It is the successor in interest of Ritz Camera Centers, Inc. ("RCC"). RCI and RCC are collectively referred to as "Ritz Camera." Over the last four years Ritz Camera has directly bought tens of millions of dollars of flash memory products from SanDisk.

14.     SanDisk Corporation is a Delaware corporation headquartered in Sunnyvale, California. It and its licensees are the world's largest suppliers of flash memory cards.

15.     Eliyahou Harari is a former director and officer of WSI, which was purchased by STM. He is a founder of SanDisk and is its current Chairman and Chief Executive officer. He resides in Los Gatos, California.

## CLASS ACTION ALLEGATIONS

### Class of Direct Purchasers of SanDisk
### Flash Memory Products

16.     Plaintiff Ritz Camera ("Class Representative") is a representative of a class of persons in the United States who, on or after June 25, 2006, directly purchased SanDisk flash memory products sold worldwide by SanDisk and joint ventures controlled by SanDisk.

COMPLAINT - Page 5

Such products include, without limitation, those sold in SanDisk's channels dedicated to retail firms, original equipment manufacturers ("OEMs"), and distributors.

### Rule 23(a) Prerequisites

17.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class numbers in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also impracticable because of the worldwide geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of Defendants' deceptive and anti-competitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether SanDisk has fraudulently obtained and converted flash memory patents; (2) whether SanDisk has monopolized a worldwide relevant market(s) for flash memory products and has monopoly power in the relevant market(s); and (3) whether this monopolization has caused members to pay unlawful, above-competitive prices to SanDisk for SanDisk flash memory products sold by them. In addition, there are common issues as to the amount of monetary relief available to the members of the Class.

18.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class

Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct in part because they have paid monopoly, above-competitive prices for SanDisk flash memory products.

19.     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the Class Representative's claims and those of the members of the Class.

## Rule 23(b)(2) Prerequisites

20.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## Rule 23(b)(3) Prerequisites

21.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

COMPLAINT - Page 7

## WORLDWIDE RELEVANT MARKET FOR
## FLASH MEMORY PRODUCTS

22.     In a relevant product market ("Flash Memory Relevant Market") SanDisk sells flash memory products using flash memory chips and cards as the only or primary input. These products employ patented technology claimed by SanDisk to be its own.  These products are used as components in a wide array of consumer, camera, mobile telephone, digital player, and computing products.  Consumers of flash memory do not view other products as substitutes for flash memory products. Flash memory products have demand and pricing that is distinct from other products, and there are no substitutes to which manufacturers of consumer, camera, computing and other products would switch in response to a small, non-transitory increase in the pricing for flash memory products.

23.     Over 75% of all flash memory products sold worldwide are either (a) manufactured and sold by SanDisk using in part licensed joint ventures controlled by SanDisk; or (b) manufactured by other licensees of the SanDisk flash memory technology controlled by SanDisk.

24.     With its controlled ventures and licensees, SanDisk has the power to control prices in, and restrict entry into, the relevant market.  It has created and maintained a monopoly in the relevant flash memory products market Flash Memory Relevant Market.

25.     Alternatively or in addition to, the relevant product market consists of flash memory cards with densities of 4GB or greater ("High-Density Flash Memory Relevant Market").  There are no substitutes for high-density flash memory products to which

COMPLAINT - Page 8

producers of consumer, camera, computing and other products would switch in response to a substantial and significant increase in price for high-density flash memory products.

26.     Over 98% of all high-density flash memory products worldwide are either (a) manufactured and sold by SanDisk using in part licensed joint ventures controlled by SanDisk; or (b) manufactured by other licensees of the SanDisk flash memory technology controlled by SanDisk.

27.     With its controlled ventures and licensees, SanDisk has the power to control prices in, and restrict entry into, the relevant market.  It has created and maintained a monopoly in the High-Density Flash Memory Relevant Market.

28.     Either relevant product market shall be referred to below for convenience as the Flash Memory Relevant Market or relevant market.

29.     In part through its control of Toshiba and other licensees, SanDisk has the power to control prices in – and restrict entry into – the relevant market.  SanDisk has created and maintained a monopoly in the relevant market.

30.     The geographic scope of the relevant market is worldwide, or, in the alternative, every country in which SanDisk contends it has patent rights over technology that is an essential input to manufacturing Flash Memory Relevant Market.

31.     The Flash Memory Relevant Market is characterized by high barriers to entry and expansion as a result of, among other things, SanDisk's purported ownership of patents covering technology necessary to manufacture flash memory cards for flash memory products; its unlawful assertion of fraudulently obtained or converted patents to control entry

COMPLAINT - Page 9

and expansion within the Flash Memory Relevant Market; and the extremely high costs necessary to enter the market.

## EXCLUSIONARY CONDUCT

32. Flash memory is memory that can be erased electronically. Flash memory allows data to be stored in a durable, compact format that retains the data after the power has been turned off.

33. SanDisk competes in a worldwide relevant market to sell flash memory products to firms in the proposed Class.

34. Through a continuing pattern of concerted exclusionary conduct, SanDisk has created and maintained a monopoly in the relevant market and – directly and through its joint ventures – has sold SanDisk technology at above competitive prices.

35. SanDisk has done so by (a) fraudulently obtaining patents from the USPTO and using them to restrain competition in part by suing STM and other competitors claiming infringement and threatening their customers; and (b) converting other flash memory patents to its competitive use which are rightfully the property of its former primary competitor, STM (by virtue of its merger with WSI).

36. SanDisk's exclusionary conduct has harmed competition in the relevant market by, among other things, increasing the prices of flash memory products paid by members of the proposed Class to above-competitive, monopoly levels.

**Fraudulent Acquisition of Patents from the**
**United States Patent and Trademark Office**
(*Walker Process* **Claim**)

37.     Over the past decade, SanDisk has fraudulently obtained patents from the

United States Patent and Trademark Office ("USPTO"), including but not limited to U.S.

Patent Number 5,172,338 (the "'338 patent") and U.S. Patent Number 5,991,517 (the "'517

patent".) In so doing SanDisk deliberately failed to disclose material information – including

key prior art – at times when that key prior art was known to SanDisk and SanDisk had a

duty to disclose that prior art to the USPTO.

38.     Furthermore, SanDisk made representations to the USPTO that were material

to the patentability of its then pending patent claims which it knew to be false.  The material

false representations and omissions were intended to induce and did induce reliance by the

patent examiners charged with determining whether to grant SanDisk's patent claims.

39.     Indeed, as reflected in the patent examiners' "reason for allowance," the

USPTO unquestionably relied on San Disk's material false statements and omissions as a

principal reason for allowing SanDisk's patent claims to issue.  But for SanDisk's material

false statements and omissions, the claims of the '338 patent and '517 patent could not have

issued as written.

**SanDisk's Original Prosecution of the '338 Patent**

40.     The '338 patent was issued on December 15, 1992.  According to its abstract,

the patent describes "[i]mprovements in the circuits and techniques for read, write and erase

COMPLAINT - Page 11

of EEprom memory [that] enable non-volatile multi-state memory to operate with enhanced performance over an extended period of time."

41.    The words "permanent inhibit" appear nowhere in any portion of the specification or the prosecution history of the '338 patent before December 15, 1992.

### Reexamination of the '338 Patent

42.    On January 11, 1996, SanDisk filed a complaint with the United States International Trade Commission ("ITC") asserting that Samsung Corporation infringed claim 27 of the '338 patent as well as claims of another patent.

43.    In its defense, Samsung claimed (as did STM in a related matter before this Court) that prior art disclosed an electrically erasable programmable read only memory ("EEPROM") function where incremental charges are added to the EEPROM until an individual cell reads in the correct state, and once the correct charge is attained, the application of any additional charge is inhibited so long as the cell is in its correct state. This is known as an "incremental" or "temporary" inhibit.

44.    As a result of this prior art, SanDisk and Samsung filed requests for reexamination of the '338 patent on September 15 and 17, 1996, respectively. They based the request on the 1983 article, *An Improved Method for Programming a Word-Erasable EEPROM*, authored by Dr. Guido Torelli in an Italian publication, Alta Frequenza-Scientific Review in Electronics, and the product brochures and technical notes for certain SGS Thompson (STM's predecessor in interest) products, the M206, M293, and M490/491

COMPLAINT - Page 12

integrated circuits. Samsung argued that the claim limitation described incremental inhibition.

45. SanDisk argued claim 27 was patentable because the inhibit function was "permanent" and not incremental or temporary, that this structure was latch 721 shown in Figure 16, and that a person of ordinary skill in the art would know that latch 721 operates as a "one-way latch" required for a permanent inhibit.

46. The USPTO relied on these and other SanDisk representations in deciding to confirm the patentability of these claims. For example, in his reasons for confirming the patentability of claim 27, the patent examiner stated that "the inhibiting feature recited in [the] claims of the '388 patent is enabled by latch 721 in Figure 16 which is a one-way resettable latch." ('388 Re-Exam, Reexamination Reasons for Patentability/Confirmation, April 16, 1997, at 3.)

47. The SanDisk representations in this regard were false. Latch 721 is a standard, two-way data latch and the inventors of the '338 patent had published an article – not disclosed to the examiner – that described an identically drawn latch as just that – a standard two-way data latch.

### Prosecution of the '517 Patent

48. The prosecution leading to the '517 patent overlapped the USPTO's reexamination of the '338 patent. At least in part, the '517 patent was intended to claim a permanent inhibit function without several of the claim limitations that exist in the '338 patent.

49.     SanDisk sought claims based on the '338 patent in the '517 patent family in December 1996. SanDisk stated that the "claims being substituted into this application are directed to inhibiting, cell by cell, further application of voltages to a plurality of cells when the individual cells are verified to have reached their desired states." This was the first mention of "cell by cell" inhibition anywhere in the chain of prosecutions leading to the '517 patent, and was done after the discovery of the Torelli article.

### SanDisk's Multiple Failures to Disclose Prior Art and Misrepresentations

50.     At all times relevant to the reexamination of the '338 patent and the prosecution of the '517 patent, SanDisk and its agents had a duty to disclose to the USPTO all information known to SanDisk that was material to the question of patentability. SanDisk also owed a duty of good faith and candor, which encompassed a duty to disclose prior art. For each of these two patents, SanDisk owed these duties from the time it made its application to the time the USPTO issued the patent. For the '338 reexamination, SanDisk also owed these duties from the time it made its request for reexamination to the time the USPTO issued its certificate of confirmation.

51.     As described below, persons substantially involved with the prosecution of the SanDisk patents repeatedly failed to disclose material prior art. Had SanDisk disclosed this prior art, the claims of the '338 patent would not have survived reexamination and the claims of the '517 patent would not have issued as written.

52.     A single law firm ("the SanDisk law firm") prosecuted both the '338 patent application and reexamination, as well as the '517 patent application on behalf of SanDisk.

Since at least February 1996, that law firm maintained a database of prior art references to assist in the preparation of San Disk's patent applications. That database contained the following prior art.

### The Simko Patents

53.　On December 26, 1989, and January 29, 1991, the USPTO issued U.S. Patent Number 4,890,259 (the "'259 patent") and U.S. Patent Number 4,989,179 (the "'179 patent"), respectively, to Richard Simko (collectively, the "Simko patents".) Both Simko patents disclose a "permanent inhibit" programming system. SanDisk knew about the Simko patents no later than January 5, 1993, when the SanDisk law firm disclosed those patents in a separate SanDisk patent prosecution that ultimately resulted in the issuance of U.S. Patent No. 5,293,560. The SanDisk law firm also disclosed the Simko patents on July 8, 1993, in a prosecution that resulted in the issuance of U.S. Patent No. 5,422,842. Accordingly, SanDisk knew about the Simko patents years before the conclusion of SanDisk's '338 reexamination and '517 prosecution.

54.　In arguing to the USPTO that the claims of the '338 and '517 patents were directed to "permanent inhibit," SanDisk was obligated to inform the USPTO of the existence of the prior art Simko patents. However, SanDisk never disclosed the Simko patents to the USPTO during either the reexamination of the '338 patent or the prosecution of the '517 patent, despite the fact that Dr. Simko was a litigation consultant to SanDisk.

55.　SanDisk's failure to disclose the Simko patents was intended to deceive the patent examiner into believing that SanDisk's claimed "inhibit" invention was novel. A

reasonable patent examiner would have been influenced by SanDisk's failure to disclose the Simko patents, and the patent examiner did rely, as is reflected in the examiner's reasons for allowance. Had SanDisk disclosed the Simko patents, the claims of the '338 patent would not have survived reexamination and the claims of the '517 patent would not have issued as written.

### The JP-100 Patent

56. On February 13, 1986, Toshiro Koyama and Tsugio Tawara published the Japanese Laid Open Patent Application JP S62-188100 (the "JP-100 patent"). Like the Simko patents, the JP-100 patent discloses a "permanent inhibit" programming system. Persons substantially involved in the prosecution of the '517 patent and the reexamination of the '338 patent knew of the JP-100 patent no later than December 30, 1998. Accordingly, SanDisk knew about the JP-100 patent well before the conclusion of SanDisk's '517 prosecution in November 1999.

57. The JP-100 patent was material to the patentability of the then pending '517 patent claims. This fact is confirmed by the decisions of two different patent examiners to whom the JP-100 patent was revealed. SanDisk prosecuted a foreign counterpart to the '517 patent in Japan, with a claim drafted in nearly identical language to claim 1 of the '517 patent. On October 23, 2001, the Japanese Appeal Board rejected this claim as obvious over the JP-100 patent prior art.

58. Similarly, in the prosecution of the U.S. Patent Application File No. 09/129,675, SanDisk initiated interference proceedings before the USPTO in which it

COMPLAINT - Page 16

asserted a claim drafted to cover nearly identical subject matter as claim 1 of the '517 patent

(the "Ohuchi Interference"). On July 12, 2006, the USPTO rejected SanDisk's interference

claims as obvious over the JP-100 patent prior art. Thus, whenever a patent examiner

considering the patentability of claims like claim 1 of the '517 has become aware of the JP-

100 patent, the claim under consideration was rejected.

59.     Because, *inter alia*, SanDisk was arguing to the USPTO that the claims of the

'517 patent were directed to "permanent inhibit," SanDisk was obligated to inform the

USPTO of the existence of the prior art JP-100 patent. However, SanDisk never disclosed

the JP-100 patent to the USPTO at any time during the '517 prosecution. SanDisk's failure

to disclose the JP-100 patent was intended to deceive the patent examiner into believing that

SanDisk's claimed "inhibit" invention was novel.

60.     SanDisk succeeded in this deception effort. A reasonable patent examiner

would have relied on San Disk's failure to disclose the JP-100 patent, and the patent

examiner did rely as reflected by the examiner's allowance of claim 1. Had SanDisk

disclosed the JP-100 patent, the claims of the '517 patent would not have issued as written.

**The Sparks Patent**

61.     On June 28, 1979, the USPTO issued U.S. Patent Number 4,752,871 (the

"Sparks patent") to Robert Sparks, *et al*. The Sparks patent discloses bulk erasing and

loading of multiple arrays simultaneously. SanDisk knew about the Sparks patent no later

than May 24, 1993, well before the conclusion of the '338 reexamination and the '517

prosecution.

COMPLAINT - Page 17

62.     On May 24, 1993, the SanDisk law firm filed an amendment responding to the USPTO's rejection of another SanDisk patent application, the 763,851 application (the "'851 application"), based on the prior art of the Sparks patent. The SanDisk law firm continued to argue about the relationship between the '851 application and the Sparks patent, including in a USPTO filing on April 5, 1996.

63.     Claim 64 of the '338 patent (which SanDisk added during the reexamination) and claim 11 of the '517 patent both claim bulk erasing and loading of multiple arrays simultaneously. Accordingly, SanDisk was obligated to inform the USPTO about the prior art of the Sparks patent for the '338 reexamination and the '517 prosecution. SanDisk's failure to disclose the Sparks patent was intended to deceive the patent examiner. A reasonable patent examiner would have relied, and the patent examiner did rely, on SanDisk's failure to disclose the Sparks patent. The '338 patent and certificate of confirmation and the '517 patent would not have been issued had SanDisk disclosed the prior art.

### The GB 145 Patent

64.     On June 28, 1979, Hartmut Schrenk filed United Kingdom Patent application GB 2 029 145 A ("GB 145 patent"). That patent disclosed inhibiting the individual erasing of any addressed cell verified to have reached its intended erase state while enabling further erasing in parallel to other addressed cells not verified. The patent was published on June 16, 1982. Thus persons at SanDisk substantively involved for SanDisk in the prosecution of the '338 reexamination, and the application that lead to the '517 patent, knew of the GB

COMPLAINT - Page 18

145 patent no later than February 23, 1996. The SanDisk law firm filed an Information Disclosure Statement citing the GB 145 patent on December 30, 1998 in SanDisk's Patent Application No. 09/129/675. Accordingly, SanDisk knew about the GB 145 patent well before the conclusion of the '338 reexamination and the '517 prosecution.

65. At least claim 40 of the '338 patent and claims 1, 2, 4, 6, and 10 of the '517 patent claim the same innovations that the GB 145 patent disclosed. SanDisk was therefore obligated to disclose the GB 145 patent in the '338 reexamination and '517 prosecution, and, insofar as it knew about the GB 145 patent at the time, in the '338 prosecution as well. The GB 145 patent is unquestionably material to SanDisk's patent claims, because the Administrative Law Judge of the United States International Trade Commission has held that the GB 145 patent anticipates '517 patent claims 1, 6, and 10, rendering the patent invalid. (*See* 560 ID at 115-117.)

66. SanDisk's failure to disclose the GB 145 patent was intended to deceive the USPTO. A reasonable patent examiner would have relied, and the patent examiner did rely, on San Disk's failure to disclose the GB 145 patent, in the '338 patent and certificate of confirmation. The '517 patent would not have been issued had SanDisk disclosed the prior art.

**The Inventor's VLSI Paper**

67. As described above, throughout the '338 reexamination, SanDisk repeatedly and knowingly misrepresented Figure 16 of the '338 patent as disclosing a "one-way latch" when, in fact, it discloses only a standard two-way data latch.

COMPLAINT - Page 19

68.     In 1992, a named inventor of the '338 and '517 patents, presented a paper co-authored by another named inventor of the '338 and '517 patents to the VLSI (Very Large Scale Integration) Symposium in Seattle, Washington.  Figure 5 of the VLSI Symposium paper is identical to Figure 16 of the '338 patent, but describes the latch (including its reset latch) as a standard data latch, not a "one-way latch."

69.     Despite its obligation to do so, SanDisk never disclosed as prior art the VLSI paper during the reexamination of the '338 patent.  Instead, SanDisk repeatedly and falsely represented to the examiner and others that Figure 16 was a "one-way latch."  SanDisk knew those representations were false when it made them, and made the representations and failed to disclose the prior art of the VLSI paper with an intent to deceive.  A reasonable patent examiner would have relied, and the patent examiner did rely, on SanDisk's misrepresentations and failure to disclose the VLSI paper in granting a certificate of confirmation for the '338 patent.  The certificate of confirmation would not have been issued had SanDisk not made misrepresentations and failed to disclose the prior art.

70.     In 2006, SanDisk filed the application that led to the '517 patent for the specific purpose of broadening SanDisk's rights and jettisoning the means-plus-function limitations of the '338 patent:

> The principal purpose of the present application is to define the cell-by-cell inhibition programming feature without all the other limitations included in claim 27 of the '338 patent that are not necessary to its patentability.  The feature of inhibiting programming on a cell-by-cell basis until all cells in a group are programmed (also referenced as 'termination') is patentable by itself.

('517 File History, Second Preliminary Amendment filed December 23, 1997 at 9-10, emphasis added.) SanDisk could not have made this statement if the Simko patents had been disclosed to the USPTO.

71.     SanDisk also never cited two additional permanent-inhibit references – the GB 145 patent and the JP 100 patent – about which it was aware. Disclosure of those references would have prevented SanDisk from representing that permanent inhibit is patentable by itself.

72.     SanDisk and its prosecuting attorney unquestionably knew of the JP 100 and the GB 145 patent at the time they were prosecuting the '517 application. In a filing in the Ohuchi Interference on December 3, 1998, for example, SanDisk's prosecuting attorney told the USPTO that he had reviewed the Ohuchi patent file history. That file history is replete with substantive discussions of the JP 100 patent and GB 145 patent prior art – and the fact that they disclose permanent inhibit. Thus, by arguing to the USPTO in the '517 prosecution that permanent inhibit was patentable by itself, SanDisk intentionally misled the USPTO as to the patentability of the '517 patent's claims.

73.     If SanDisk had not fraudulently obtained the patents described above and wrongfully enforced those patents against competitors, the technology embodied in those patents would be freely available to competing providers of flash memory products, with the result that there would be more competition and lower prices in the relevant market.

**Concerted Conduct to Convert
the MSI/STM Patents**

74.     In support of its monopolization, SanDisk and Harari have conspired to disadvantage SanDisk's major competitor, STM, by fraudulently converting to SanDisk control STM's flash memory patents (other than the '338 and '517 patents).  In so doing, SanDisk and Harari have competitively disadvantaged STM and suppressed competition in the manufacture of flash memory products.

75.     Harari had served as an employee, officer, consultant and/or director of WSI.

76.     WSI was co-founded in 1983 by Harari.  It designed and sold programmable system devices, including memory systems and nonvolatile memories.  While Harari was an officer and/or director of WSI, it was designing and developing flash memory products.

77.     On July 27, 2000, STM and WSI merged, with STM remaining as the surviving corporation.  Pursuant to the Agreement and Plan of Merger between STM and WSI, STM succeeded to "all rights and property" of WSI.

78.     Harari served numerous roles at WSI between its founding on August 1, 1983, and his resignation in March of 1989, including:

- Chief Executive Officer (CEO):  August 1, 1983 until June 11, 1986;

- Chief Technology Officer (CTO):  June 11, 1986 until February 28, 1988;

- Director:  August 1, 1983 until March 15, 1989; and

- Chairman of the Board:  November 30, 1983 until June 15, 1985, and again from June 11, 1986 until February 28, 1988.

COMPLAINT - Page 22

**Harari's Patent Assignment Obligation**

79.    Early in the period that Harari was an employee, officer and director of WSI, he signed two agreements with the company:  (1) an Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984 (the "Inventions Agreement"), and (2) a Key Employee Agreement dated February 27, 1984 (the "Key Employee Agreement").

80.    Through the Inventions Agreement, Harari agreed to the following:

> 2. I will maintain in confidence and *will not disclose or use, either during or after the term of my employment without the prior written consent of [WSI], any proprietary or confidential information or know-how belonging to [WSI] . . . .* Upon termination of my employment or at the request of my supervisor before termination, I will deliver to [WSI] all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to [WSI's] business. . . .

> 3. I will promptly disclose and describe to [WSI] (i) all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable, made or conceived by me, either alone or with others, during the term of my employment, provided that [WSI] shall receive such information in confidence. *I hereby assign and agree to assign to [WSI] my entire right, title and interest in and to such Inventions which relate in any way to or are useful in [WSI's] business as presently conducted or as conducted at any future time during my employment, and agree to cooperate with WSI and its designee(s) both during and after my employment in the procurement and maintenance, at [WSI's] expense and at its discretion, of patents, copyrights, and/or other protection of [WSI's] rights in such inventions.* I will keep and maintain adequate and current written records of all such Inventions, which shall be and remain the property of the [WSI].

> 4. . . . .

> (c)  *During my employment by [WSI] I will not engage in any employment, consulting or other activity in any business without [WSI's] express written agreement.*

(Emphasis added).

COMPLAINT - Page 23

## WSI's Development of Flash Memory Chips

81.   WSI, a company which designed and produced various kinds of semiconductor memory (memory on a chip) for computers and electronic devices, dedicated substantial resources and effort to research and development of new memory technologies.

82.   Semiconductor memory can be either volatile or nonvolatile.  Volatile memory requires a power source to maintain data in memory, while nonvolatile memory requires no power to retain data.

83.   The main memory in computers has traditionally been dynamic random access memory ("DRAM") or static random access memory ("SRAM") both of which are volatile memories.  Thus, if the computer is turned off, any data stored in DRAM or SRAM will be lost.

84.   Computers have also used nonvolatile memories such as read only memory ("ROM") and programmable read only memory ("PROM") and electrically programmable read-only memory ("EPROM").

85.   In the late 1980s, when Harari was still an employee, officer and director of WSI, a new nonvolatile memory technology called electrically erasable programmable read only memory ("EEPROM" or "E$^2$PROM") was developed which offered a substantial advantage over ROM, PROM or EPROM because it was electrically reprogrammable.  When an EEPROM is quickly erasable and reprogrammable it is referred to as "flash EEPROM," or "flash memory."  If the computer is turned off, data in these memories are not lost.

COMPLAINT - Page 24

86.     While Harari was its chief technical officer, WSI began development work on flash memory.  By at least 1987, WSI was involved in research and development efforts regarding flash memory technology.  By 1989, WSI had a prototype flash memory product, and was anticipating revenues from this line of business.  As an employee, CTO and/or director of WSI, Harari was aware of WSI's research and development efforts with regard to flash memory.

87.     As a director and officer of WSI, Harari was in a position of trust and confidence and had fiduciary obligations, including at least the following:  (a) to act in good faith and in the best interests of WSI and its shareholders; (b) to put the interests of WSI and its shareholders ahead of his private interests; (c) to not enter into any business in competition with WSI; (d) to bring business opportunities in the line of business of  WSI to the attention of WSI and not to appropriate the opportunity for himself; (e) to protect and preserve the assets of WSI; and (f) to disclose material facts to WSI concerning his business dealings in the same field as WSI's business endeavors.

88.     In concert with SanDisk, and in aid of its monopolization, Harari violated these obligations to convert STM flash memory patents to SanDisk.

**Harari Filed Four Patent Applications While a Director of
and Consultant to WSI, But Did Not Assign Them to WSI**

89.     WSI, in order to protect its intellectual property, routinely applied for United States patents to cover inventions developed in the course of its business.  As an employee, officer, and director of WSI, Harari had fiduciary and contractual obligations to assist WSI

COMPLAINT - Page 25

with the protection of its intellectual property, and to assign inventions which related to WSI's business to WSI.

90.    Harari and WSI entered into an agreement dated February 29, 1988 (the "Consulting and Directorship Agreement".) In this agreement Harari resigned his duties as an employee and officer of WSI effective February 28, 1988.

91.    In the Consulting and Directorship Agreement, WSI and Harari also agreed that: (a) WSI would continue to nominate Harari as a director until an IPO took place; (b) Harari would be a paid consultant to WSI for 11 months at his then current salary; (c) WSI had the right to extend the consulting agreement for a period of six months; and (d) Harari would "continue to be bound by and comply with the terms of his Employee Agreement Regarding Confidentiality and Inventions dated February 22, 1984" – the Inventions Agreement.

92.    The obligations in the Inventions Agreement as extended by the Consulting and Directorship Agreement included, among other things, three important obligations:  (a) to maintain in confidence and not to use or disclose any proprietary, confidential or knowhow of WSI without the company's prior written consent; (b) to assign "all inventions, improvements, discoveries and technical developments ("Inventions"), whether or not patentable"; and (c) Harari's agreement that he would "not engage in any employment, consulting or other activity in any business without the Company's express written agreement."

93.     Furthermore, as a director of WSI, Harari continued in a position of trust and confidence and had all of the same fiduciary obligations he previously had when he was an officer and director.

94.     On April 26, 1988, less than two months after resigning as an officer of WSI, but while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/185,699 with the USPTO which resulted in U.S. Patent 4,933,739, entitled "Trench resistor structures for compact semiconductor memory and logic devices." This patent relates to memory devices that were within WSI's line of business.

95.     On June 8, 1988, while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/204,175 with the USPTO, which resulted in twenty-two issued patents. This application related to flash memory products that were within WSI's line of business.

96.     On July 8, 1988, while still serving as a director of and consultant to WSI with a continuing obligation to assign inventions to WSI, Harari filed Patent Application 07/216,873 with the USPTO, which resulted in three issued patents. This application related to memory products that were within WSI's line of business.

97.     On March 15, 1989, Harari filed Patent Application 07/323,779 with the USPTO, which resulted in U.S. Patent 5,070,032, entitled "Method of making dense flash EEPROM semiconductor memory structures." This patent relates to flash memory devices that were within WSI's line of business.

98.     On March 21, 1989, Harari tendered his resignation from the Board of Directors of WSI, requesting that his resignation date be back-dated to March 15, 1989 – the same day he had filed his most recent patent application.  Harari made this request without disclosing to the Board that he had filed any of the above-referenced patent applications.

### Harari Filed Two Patent Applications Three Weeks After Tendering His Resignation as a Director of WSI

99.     In addition to the four applications Harari filed while still a director of WSI, Harari filed two more patent applications three weeks after tendering his resignation as a director of WSI, but before the Board of Directors accepted his resignation.  On information and belief, STM alleges that the inventions disclosed in these applications were invented and developed while Harari was an officer and/or director and/or a consultant of WSI.

100.    Specifically, on April 13, 1989, Harari filed two patent applications with the USPTO – numbered 07/337,566 and 07/337,579.  These applications related to flash EEPROM memories which were then under development at WSI.  Patent Application 07/337,566 has resulted in the issuance of twenty-one patents and Patent Application 07/337,579 has resulted in the issuance of two patents.

101.    On May 17, 1989, the Board of Directors of WSI met and accepted Harari's resignation effective after the Board meeting of March 15, 1989.  The Board agreed to Harari's request to back-date his resignation without knowing that Harari had filed patent applications on (a) April 26, 1988; (b) June 8, 1988; (c) July 8, 1988; (d) March 15, 1989; and (e) April 13, 1989.

COMPLAINT - Page 28

**While an Employee, Officer and/or Director of WSI, Harari
Only Disclosed and Assigned One Patent Application to WSI**

102.    On information and belief, Harari did not disclose any of the following six patent applications to WSI at any time: (a) 07/185,699; (b) 07/204,175; (c) 07/216,873; (d) 07/323,779; (e) 07/337,566; or (f) 07/337,579.  WSI had no way of knowing of Harari's conduct, as patent applications filed with the USPTO are confidential and Harari did not disclose this information to WSI.

103.    On information and belief, the ideas disclosed in these patent applications were known to or conceived by Harari while he was a director and/or consultant of WSI, and the evidence at trial may prove that he had known of or conceived of these ideas during his tenure as an employee and officer as well.  Moreover, on information and belief, STM has contended that Harari actively worked on the preparation of all these patent applications during his tenure as a director and/or consultant to WSI, and that Harari concealed this activity from WSI.

104.    These six patent applications all contain ideas and designs that would have benefitted the design and development work being done at WSI on flash memory and materially aided it in competing with SanDisk to produce flash memory products.

105.    In contrast to the six patent applications Harari filed in his own name without disclosing them to WSI, Harari disclosed only *one* patent application to WSI during his entire five-and-a-half year tenure as an employee, officer, director and/or consultant.  Harari was forced to disclose that patent application because there was a co-inventor on the application who fulfilled his obligations to make the disclosure.  In other words, Mr. Harari concealed

from WSI every patent application he was able to conceal because he was either listed as the sole inventor or a co-inventor with a non-WSI employee.

106.    Harari's assignment of only a single application to WSI is particularly noteworthy in light of the significant number of applications he has filed during his career. Over a period of twenty-eight years, Harari has filed 131 patent applications – an average of almost five applications per year.  However, Harari disclosed only one patent application to WSI during his entire five-and-one-half year tenure as an employee, officer, director and/or consultant of that company.  In fact, from 1975 until 1983, Harari filed at least one patent application each year.

107.    However, in 1984, 1985, 1986, and 1987, all years during which Harari served as an employee, officer and/or director of WSI, Harari did not file a single patent application.

108.    In the years following his departure from WSI, from 1989 until 2002, Harari filed at least *four* patent applications *each* year.  Indeed, within the first five months after Harari resigned his position as CTO of WSI, while still a director and consultant to WSI with an obligation to assign inventions, Harari filed three different applications with the USPTO – none of which was disclosed or assigned to WSI.  Each of these patent applications likely would have been in process for months before filing with the USPTO.

109.    Perhaps most tellingly, Harari filed an application on March 15, 1989, a date which he later requested be set as his effective date of resignation from the board of directors of WSI. Harari's attempt to back-date his resignation to coincide with the filing of this

COMPLAINT - Page 30

application is clear evidence of his intent to conceal his patent filing activities from WSI, and to obtain for himself patent rights that he know should have been assigned to WSI.

### Harari Founded SanDisk, a Competitor of WSI, While Serving as a Director of WSI

110.   On or about June 1998, Harari founded SanDisk.

111.   Harari founded SanDisk while serving as a Director of WSI, and therefore was under a fiduciary obligation not to enter into any business in competition with WSI. Moreover, Harari had a fiduciary obligation to present corporate opportunities in WSI's line of business to WSI, and not to appropriate such opportunities to himself or another company.

112.   On information and belief, WSI, since its inception, has focused its research and development efforts on developing flash memory technology since at least 1987, and was continuing to develop such technology at the time SanDisk was formed by Harari.

113.   Moreover, at the time Harari founded SanDisk, he was well aware of WSI's research into flash memory technology.  Harari served as CTO of WSI, and thus headed WSI's research efforts on flash memory until February of 1988. As a Director of WSI, Harari received reports regarding WSI's flash memory work until at least January of 1998, several months after he founded SanDisk and filed four of the patent applications whose ownership is at issue in this suit.

114.   From its inception and founding by Harari, SanDisk was in direct competition with WSI. As an officer and/or director of WSI, Harari had an obligation to present any corporate opportunity appropriate for WSI.  Harari's involvement with concerted action on

behalf of SanDisk has seriously impeded STM's capacity to compete in the manufacture and sale of flash memory products.

115.    Furthermore, in aid of SanDisk's monopolization, Harari assigned the patents which resulted from the above-described applications to SanDisk, thereby benefitting a company in direct competition with WSI to whom he owed fiduciary duties of loyalty and good faith. Those assignments have resulted in competitive injury to STM, the successor-in-interest to WSI.

116.    If SanDisk and Harari had not wrongfully converted the patents described above, STM would be a much more viable competitor in the relevant market for flash memory products, with the result that there would be more competition and lower prices.

**Threats to Customers of Competitors**

117.    In addition to the use of threats of infringement directed at its competitors for the alleged use of fraudulent or converted patents to exclude them from the relevant market, SanDisk has threatened members of the proposed Class who purchase flash memory from SanDisk competitors. SanDisk has threatened such class members with the prospect that they will be left holding large quantities of unusable flash memory products manufactured by STM and others that refuse to license SanDisk's fraudulent or converted technology (if SanDisk's claims infringement actions are successful). SanDisk has also threatened members of the proposed Class who purchase from SanDisk competitors that they will be made to purchase flash memory at disadvantageous prices and terms if they are later forced to turn to SanDisk to receive the necessary flash memory for their products. In a successful effort to drive

COMPLAINT - Page 32

customers from STM, SanDisk has also enforced document and deposition subpoenas against numerous STM customers.

## INJURY TO COMPETITION

118.    Aided by Defendant Harari, SanDisk has monopolized the Flash Memory Relevant Market by exclusionary patent fraud and patent conversion, as well as threats to competitor customers.  SanDisk has succeeded in driving STM out of the flash memory business.  In 2008 STM transferred its flash memory business to a joint venture with Intel Corporation.  This occurred after SanDisk inflicted more than $20 million in legal fees on STM in the defense of SanDisk's three patent claims.    As a consequence of the monopolization, SanDisk and joint ventures under its control have sold flash memory products at above-competitive, monopoly prices to members of the proposed Class in the Flash Memory Relevant Market and injured competition therein.

## COUNT ONE

### (Conspiracy to Monopolize)

119.    Plaintiff incorporates the allegations of paragraphs 1 through 118 as though set forth here in their entirety.

120.    SanDisk and Harari have conspired to monopolize, and have monopolized and maintained a monopoly in, the Flash Memory Relevant Market.

121.    They have done so with specific intent to monopolize and have accomplished this through numerous overt acts, including fraudulent omissions and misrepresentations in connection with the filing and prosecution of the '338 and '517 patents, by concerted conduct

COMPLAINT - Page 33

to exploit those invalid patents so as to exclude competition, by the concerted conversion of WSI/STM patents so as to reduce competition in the relevant market, and by threats to competitor customers in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. SanDisk's monopolization strategy has been implemented in concert with Defendant Harari, who has profited from and aided the conspiracy and who had the specific intent to assist SanDisk in its monopolization even though he was an employee and officer of, and owed fiduciary duties to, WSI.

122. SanDisk is engaged in interstate and foreign commerce, and the vast majority of its past, present, and future sales in the relevant market has and will occur in such commerce.

123. As a direct and proximate result of Defendants' unlawful concerted conduct, competition in the relevant market has been severely harmed through higher prices and reduced competition, quality, innovation, and consumer choice to the detriment of consumers.

124. As a direct and proximate result of Defendants' unlawful conduct, the members of the proposed Class have been injured in their business or property by the payment of above-competitive pricing.

## COUNT TWO

### (Monopolization)

125. Plaintiff incorporates the allegations of paragraphs 1 through 118 as though set forth here in their entirety.

COMPLAINT - Page 34

126.    SanDisk has monopolized the Flash Memory Relevant Market, and maintained that monopoly, by fraudulent omissions and misrepresentations in connection with the filing and prosecution of the '338 and '517 patents, by conduct to exploit invalid patents so as to exclude competition, by the conversion of WSI/STM patents so as to reduce competition in the relevant market, and by threats to competitor customers in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

127.    SanDisk is engaged in interstate and foreign commerce, and the vast majority of its past, present, and future sales in the relevant market has and will occur in such commerce.

128.    As a direct and proximate result of SanDisk's unlawful concerted conduct, competition in the relevant market has been severely harmed through higher prices and reduced competition, quality, innovation, and consumer choice to the detriment of consumers.

129.    As a direct and proximate result of SanDisk's unlawful conduct, the members of the proposed Class have been injured in their business or property by the payment of above-competitive pricing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and as a representative of members of the defined proposed Class, prays that:

A.    This Court declare that Defendants' conduct constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

COMPLAINT - Page 35

B.      This Court permanently enjoin Defendants and their agents and employees from continuing their unlawful actions set forth herein;

C.      Plaintiff recover treble damages;

D.      Plaintiff recover its reasonable attorneys' fees and costs as allowed by law;

E.      Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.      Plaintiff be granted such other and further relief as the Court deems just and equitable.

**JURY DEMAND**

1 | Dated: June 24, 2010

Respectfully submitted,

2

/s/ Colleen Duffy-Smith

3 | KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL PLLC

4 | Steven F. Benz (D.C. Bar No. 428026)*

5 | Joseph S. Hall (D.C. Bar No. 475057)*
Kfir B. Levy (CA Bar No. 235272)

6 | 1615 M St., N.W.

7 | Suite 400
Washington, D.C. 20036

8 | Telephone:  (202) 326-7900

9 | Telecopy:  (202) 326-7999
Email:  sbenz@khhte.com

10 |         jhall@khhte.com

11 |         klevy@khhte.com

MORGAN DUFFY-SMITH &
TIDALGO LLP
Colleen   Duffy-Smith   (CA   Bar   No.
161163)
1960 The Alameda, #220
San Jose CA 95126
Telephone:  (408) 244-4570
Email: cduffysmith@mdstlaw.com

BERRY & BARUCH
R. Stephen Berry (D.C. Bar No. 234815)*
Gregory Baruch (D.C. Bar No. 420137)*
1717 Pennsylvania Ave. NW
Suite 450
Washington, DC  20006
Telephone:  (202) 296-3020
Telecopy:  (202) 296-3038
Email:  sberry@berry-baruch.com
        gbaruch@berry-baruch.com

12

13

14

15 | *moving for pro hac vice admission

16

17 |                     *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - Page 37

1

**Appendix A**

2

Colleen Duffy-Smith (State Bar No. 161163)
3   Morgan Duffy-Smith & Tidalgo LLP
1960 The Alameda #220
4   San Jose CA 95126
(408) 244-4570
5   [Additional counsel appear on signature page]

6   Attorneys for the Plaintiffs

7              UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE DIVISION)
9

10   **SANDISK CORPORATION,**         )
                                       )   CASE NO. C 04-04379 JF
11              Plaintiff,             )
                                       )   **ADMINISTRATIVE MOTION**
12   v.                               )   **TO  CONSIDER  WHETHER**
                                       )   **CASES  SHOULD BE RELATED**
13   **STMicroelectronics, Inc. et al.,** )
                                       )   **(N.D. Cal. Civ. L.R. 3-3, 3-12 and 7-11)**
14              Defendants.            )
     ─────────────────────────────────)
15

16        Pursuant to Local Rule 3-12(b), Ritz Camera and Image, LLC ("Ritz Camera"), hereby

17   respectfully submits this Administrative Motion to Consider Whether Cases Should Be Related.

18   Ritz has just filed a case in this court, *Ritz Camera and Image, LLC v. Sandisk Corporation  et al.*,

19   No. _____, the allegations of which involve the same conduct and many of the same claims involved

20   in this case and in other cases which this Court has already deemed to be related.

21        The undersigned counsel have conferred with counsel of record in this case, which has

22   [agreed to stipulate] [refused to stipulate] that *Ritz Camera* is a related case.

23        Ritz Camera submits that under any prevailing standard the cases are "related." Therefore,

24   it submits that the interests of justice and judicial economy favor recognizing that the cases are

25   related pursuant to Local Rules 3-3 and 3-12.

26              **The Actions Involve Substantially The Same Conduct**

27        Cases are related when the following requirements are satisfied:

28

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF

1   (1) The actions concern substantially the same parties, property, transaction or event; and

2

3   (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges.

4   Local Rule 3-12(a).

5       Manifestly, the first criterion of Local Rule 3-12(a) is met – that "[t]he actions concern

6   substantially the same parties, property, transaction or event." SanDisk Corporation ("SanDisk") is

7   a party in both cases, the same patents are involved in both cases, and both cases focus on the same

8   conduct by SanDisk – specifically, the validity of SanDisk's '338 and '517 patents and SanDisk's

9   conduct monopolizing alleged relevant markets for flash memory products through the fraudulent

10  acquisition of patents and the misuse and enforcement of such patents to exclude competition. The

11  same relevant product markets, products, and patents are involved in both cases.

12      Specifically, both SanDisk's complaint and STMicroelectronics's counterclaim in this case

13  involve the same conduct, patents, and legal standards at issue in Ritz Camera's claims. SanDisk's

14  complaint necessarily involves the issue of the validity of its '338 and '517 patents.

15  STMicroelectronics's counterclaims involve the same relevant markets, the same allegations of

16  misrepresentation and fraud upon the Patent and Trademark Office, and the same allegations of

17  monopolization as the Ritz Camera claim.

18      Flash memory chips are typically placed on various-sized cards with controllers, and these

19  cards are used to store digital information for mobile phones, digital cameras, digital video

20  camcorders, gaming devices, portable digital audio/video players, personal computers, and global

21  positioning systems (GPSs). Ritz Camera – like STMicroelectronics in its matter before this Court

22  and in State court matters – alleges that SanDisk has unlawfully seized control of the worldwide

23  production of flash memory products by obtaining and employing fraudulent and unlawfully-

24  converted patents.

25      As a consequence, SanDisk controls over 75% of all flash memory products sold worldwide

26  and has monopolized this relevant product market. As a consequence, SanDisk and Toshiba

27

28

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF                    -2-

1    Corporation (and its subsidiaries) have charged above-competitive, monopoly prices to the direct

2    purchasers of flash memory products, including Ritz Camera.

3         Like STMicroelectronics, Ritz Camera has made the same relevant market allegations:  a

4    flash memory product market and, in the alternative, a high-density flash memory product market.

5    Like Ritz Camera, STM Microelectronics alleges that SanDisk and entities under its control engaged

6    in a course of unlawful conduct intended to monopolize those markets.

7         The conduct Ritz Camera alleges in its complaint is the same conduct that was at issue in this

8    case. SanDisk engaged in extensive misrepresentation to the U.S. Patent and Trademark Office,

9    including pervasive failure to disclose prior art known to SanDisk that would have shown that

10   SanDisk's patents were invalid. These claims include so-called *Walker Process*" claims that

11   SanDisk unlawfully misrepresented that the '338 patent involved a permanent (rather than

12   incremental or temporary) inhibit function (or "latch"), in order to defeat reexamination claims

13   brought by Samsung Corporation in response to SanDisk's infringement claims; and repeatedly

14   failed  to  disclose prior art in connection with both the '338 and the '517 patents (including prior

15   art covered by patents issued to Richard Simko (the "Simko patents"); to Toshiro Koyama and

16   Tsugio Tawara (the "JP-100 patent").  Indeed, Japanese patent authorities rejected SanDisk's patent

17   request – identical to claim 1 of its '517 patent – as obvious in light of the JP-100 patent prior art;

18   to Robert Sparks and others (the "Sparks patent"); and to Hartmut Schrenk (the "GB 145 patent").

19   SanDisk also failed to disclose a paper presented to the VLSI (Very Large Scale Integration)

20   Symposium in 1992 that established that the supposedly novel latch set forth in the '338 patent was

21   in fact a standard two-way data latch, rather than the "one-way latch" that SanDisk later claimed.

22        Ritz Camera has also made additional allegations relating to other conduct by SanDisk that

23   also contributed to the monopolization of the relevant product markets.  These allegations involve

24   the same conduct alleged in other cases before this Court which this Court has already deemed to

25   be "related" to this case.  *See* Docket No. 59 (Order Relating Cases) (Nov. 23, 2005); Docket No.

26   168 (May 8, 2008) (Stipulation).  In two consolidated cases deemed "related" to this case

27   (*STMicroelectronics, Inc. v. Harari et al.*, Case Nos. C 05-4691 JF, filed Nov. 16, 2005, and C 08-

28

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF                          -3-

1    2332 JF, filed May 6, 2008),[1] STMicroelectronics alleged that Eliyahou Harari and SanDisk had

2    engaged in unfair competition by converting numerous patents to SanDisk's ownership that

3    rightfully belonged to STMicroelectronics.  These claims are similar to other claims made by Ritz

4    Camera in its complaint.  Both Ritz Camera and STMicroelectronics allege that Harari was an

5    employee, officer, and director of STMicroelectronics's predecessor-in-interest Wafer Scale

6    Integration, Inc. ("WSI"), and had a contractual obligation to assign all patents for all inventions he

7    developed during his employment.  Both Ritz Camera and STMicroelectronics further allege that,

8    despite this obligation, Harari filed six patent applications for work performed during his

9    employment but assigned them not (as required) to WSI but to SanDisk, which he founded in

10   competition with WSI while employed by, and in violation of his obligations to, WSI.

11         This Court has already deemed these cases brought by STMicroelectronics against Harari and

12   SanDisk to be "related" to this case.  See Docket No. 59 (Order Relating Cases) (Nov. 23, 2005);

13   Docket No. 168 (May 8, 2008) (Stipulation).   The fact that Ritz Camera's claims overlap

14   substantially with these cases is further reason for deeming Ritz Camera's case to be "related" to this

15   case.

16        **Treating The Cases As Related Will Prevent Unduly Burdensome**
**Duplication And Potentially Conflicting Results**

17         Treating cases as related is called for if  there will be either an unduly burdensome

18   duplication of labor and expense or conflicting results. Local Rule 3-12(a)(2). Although it is

19   sufficient to meet either criterion, Ritz Camera submits that both of these are met here.  Local Rule

20   3-12, on treatment of related cases, applies equally to any case that "is *or was* pending in this

21   district." (Emphasis added.)  It therefore makes no difference that this case has settled, if treating

22   the cases separately will result in an unduly burdensome duplication of labor and expense or

23   conflicting results under 3-12(a).  Indeed, SanDisk itself has asked this Court to deem cases related

24   when one of the cases was no longer pending. *See* Docket No. 168 (May 8, 2008).

25

26        [1]    For the Order granting consolidation (May 30, 2008), *see* Docket No. 102 in Case

27   No. C 05-4691 JF, and Docket No. 14 in Case No. C 08-2332 JF.  Both cases, which had been

28   removed to this Court, were ultimately remanded to state court.

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF          -4-

1       Ritz Camera submits that this is plainly the case here.  This Court presided over this case for

2  five years during which the case was extensively litigated and brought to the eve of trial. This

3  necessarily involved this Court's substantial consideration of the facts, issues, and legal standards

4  at issue in the case, including extensive proceedings on claims construction, motions to dismiss, and

5  summary judgment. *See, e.g.*, Docket No. 116 (motion to dismiss counterclaims); 149-150 (hearing

6  on motion to dismiss); 175 (summary judgment motion on counterclaims); 271-272 (summary

7  judgment hearing); 273 (order on summary judgment); 304-305 (case management conference); 308

8  (order on motions to bifurcate and amend); 311 (motion to dismiss some counterclaims); 328 (bench

9  trial date set on inequitable conduct).

10      Ritz Camera's allegations necessarily involve complex and highly technical issues of both

11  patent and antitrust law – issues that this Court has already had occasion to address over five years

12  in this case. To require a new judge to come fresh to these same issues would be needlessly

13  burdensome and duplicative, and would raise the risk of inconsistent adjudications.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF               -5-

1   Dated: June 24, 2010                    Respectfully submitted,

2
                                            BY: _____
3   KELLOGG, HUBER, HANSEN,                 MORGAN DUFFY-SMITH &
    TODD, EVANS & FIGEL PLLC                TIDALGO LLP
4   Steven F. Benz (D.C. Bar No. 428026)*   Colleen Duffy-Smith (CA Bar No. 161163)
    Joseph S. Hall (D.C. Bar No. 475057)*   1960 The Alameda, #220
5   Kfir B. Levy (CA Bar No. 235272)        San Jose CA 95126
    1615 M St., N.W.                        Telephone:  (408) 244-4570
6   Suite 400                              Email: cduffysmith@mdstlaw.com
    Washington, D.C. 20036
7   Telephone:  (202) 326-7900              BERRY & BARUCH
    Telecopy:  (202) 326-7999               R. Stephen Berry (D.C. Bar No. 234815)*
8   Email:  sbenz@khhte.com                 Gregory Baruch (D.C. Bar No. 420137)*
            jhall@khhte.com                 1717 Pennsylvania Ave. NW
9           klevy@khhte.com                 Suite 450
                                            Washington, DC  20006
10                                          Telephone:  (202) 296-3020
                                            Telecopy:  (202) 296-3038
11                                          Email:  sberry@berry-baruch.com
                                                    gbaruch@berry-baruch.com
12
    *moving for pro hac vice admission
13
                                 Attorneys for Plaintiff
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADMINISTRATIVE MOTION - RELATED CASES -
CASE NO. C 04-04379 JF                    -6-