1

2                                                          **E-Filed 2/24/2011**

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11   RITZ CAMERA & IMAGE, LLC, a Delaware          Case Number 5:10-cv-02787-JF/HRL
     limited liability company, on behalf of itself and
12   others similarly situated,                     ORDER[1] GRANTING IN PART AND
                                                    DENYING IN PART MOTION TO
13                              Plaintiff,          DISMISS FIRST AMENDED
                                                    COMPLAINT
14           v.
                                                    [Re: Docket No. 39]
15   SANDISK CORPORATION; ELIYAHOU
     HARARI,
16                              Defendants.

17

18                            I. BACKGROUND

19          On June 25, 2010, Plaintiff Ritz Camera & Image, LLC ("Ritz") filed the instant action

20   against Defendants SanDisk Corporation ("SanDisk") and Eliyahou Harari ("Harari"), alleging

21   violations of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2  ("Sherman Act").  Ritz filed its

22   first amended complaint ("FAC") as of right on August 25, 2010.  On behalf of a purported

23   class, Ritz asserts claims for conspiracy to monopolize and monopolization of the flash memory

24   market.  In particular, Ritz alleges that SanDisk and Harari conspired to monopolize and have

25

26

27   _____

28         [1] This disposition is not designated for publication in the official reports.

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

1  monopolized the market for NAND flash memory products[2] through the assertion of fraudulent

2  patents.  FAC ¶¶ 124-35.  Ritz claims that Defendants have reduced competition in the market by

3  pursuing unfounded actions for patent infringement and by engaging in retaliatory conduct

4  toward consumers who use competing products.  *Id.*

5        Ritz alleges that Harari tortiously converted flash memory technology owned by his

6  former employer Wafer Scale Integration ("WSI"), which led to the issuance of U.S. Patent Nos.

7  5,172,338 and 5,991,517, referred to herein as the '338 and '517 patents or the "crown jewel

8  patents."[3]  *Id.* ¶¶ 93-102, 126, 132.  According to Ritz, Harari obtained these patents by

9  intentionally failing to disclose invalidating prior art to the U.S. Patent and Trademark Office

10 ("USPTO") and by making affirmative misrepresentations to the USPTO.  *Id.* ¶¶ 35-73, 126,

11 132.  Allegedly, Harari and his newly-formed company–SanDisk–then exploited the crown jewel

12 patents by suing competitors for infringement.  *Id.* ¶¶ 110-122, 126, 132.  Ritz also claims that

13 Defendants threatened competitors' customers through harassing litigation and sales tactics, and

14 retaliated against Ritz specifically by terminating their business relationship after the

15 commencement of the instant litigation.  *Id.*

16       Ritz  alleges that Defendants' enforcement of the subject patents has suppressed

17 competition in the NAND flash memory product market, as evidenced by the March 2008

18 market departure of SanDisk's largest competitor, STMicroelectronics, Inc. ("STM").  *Id.* ¶ 115.

19 Ritz also claims that Defendants entered into an anticompetitive settlement agreement with STM

20 in an effort to drive STM from the market.  *Id.* ¶¶  112-120, 126, 132.  These actions allegedly

21 have resulted in reduced market competition and a steep increase in prices for NAND flash

22

23 ───────────────

24        [2] NAND flash memory is a form of digital storage technology used in consumer
    electronic devices. FAC ¶¶ 1-2.  It is available in a "raw" or a "finished" format.  *Id.*  "Raw"
25 flash memory is the basic flash memory wafer that is produced by a fabrication plant or fab.  *Id.*
    "Finished" flash memory products are used in or with various electronic products such as
26 personal computers and digital cameras.  *Id.*

27        [3] Ritz also alleges that Defendants used the misappropriated technology to obtain a 1989
    patent that served as a predecessor to the crown jewel patents.  *Id* ¶ 101.  Ritz does not allege
28 that Defendants sought to enforce the 1989 patent.

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

1  memory. *Id.* ¶¶ 129, 134.

2      Defendants move to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6).  They argue

3  that Ritz (1) has failed to allege the existence of an antitrust conspiracy; (2) lacks standing to

4  pursue a *Walker Process*[4] fraud claim; (3) lacks antitrust standing; and (4) has failed to allege a

5  relevant antitrust market, which is a necessary predicate to any antitrust claim.  Ritz opposes the

6  motion.  The Court heard oral argument on December 17, 2010.  For the reasons set forth below,

7  the motion will be granted in part and denied in part.

8                           **II. LEGAL STANDARD**

9      "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a

10  cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

11  *Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008).  For purposes of a motion to

12  dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in

13  the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843,

14  23 L.Ed.2d 404 (1969).  "To survive a motion to dismiss, a complaint must contain sufficient

15  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim

16  has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

17  reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,*

18  129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556,

19  570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Thus, a court need not accept as true conclusory

20  allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact

21  contained in the complaint.  *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-755 (9th

22  Cir.1994).

23      Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot

24  be cured by amendment. *Lucas v. Dep't of Corr.,* 66 F.3d 245, 248 (9th Cir.1995).  When

25  amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*,

26  90 F.3d 386, 393 (9th Cir.1996).

27  ────────────

28      [4] *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172 (1965).

3

1

### III. DISCUSSION

2

**A.  *Walker Process* Standing**

3

The Court first must determine whether Ritz has standing to bring a *Walker Process*

4

claim, as each of Ritz's claims is dependent upon the theory that Defendants have engaged in the

5

enforcement of fraudulently-obtained patents.  Neither the Supreme Court nor the Ninth Circuit

6

has determined whether direct purchasers, such as Ritz, have standing to assert a *Walker Process*

7

claim.[5]

8

Generally, *Walker Process* challenges are brought by competitors as counterclaims in

9

patent infringement actions.  *In re DDAVP*, 585 F.3d 677, 689 (2d Cir. 2009).  *Walker Process*

10

claims reside at the junction of patent and antitrust law, allowing plaintiffs to "strip [a patent-

11

holder] of [his] exemption from the antitrust laws" if his patent has been procured by fraud.  382

12

U.S. at 177.  The Supreme Court's decision in *Walker Process* permits plaintiffs to seek damages

13

under § 2 of the Sherman Act for "monopolistic action taken under . . . fraudulent patent

14

claim[s]."  *Id.* at 176.

15

Ritz argues that because the Supreme Court did not limit its holding to a particular class

16

of plaintiffs, direct purchasers and competitors are equally entitled to standing.  *Walker Process*,

17

382 U.S. at 176. ("The gist of Walker's claim is that since [Defendant] obtained its patent by

18

fraud it cannot enjoy the limited exception to the prohibitions of § 2 of the Sherman Act, but

19

must answer under that section . . . to *those injured* by any monopolistic action taken under the

20

fraudulent patent claim.") (emphasis added).  It contends that both precedent and public policy

21

support this interpretation.  *In re Netflix Antitrust Litigation*, 506 F. Supp. 2d 308, 316 (N.D. Cal.

22

2007) relied on *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc.,* 402 F. Supp. 2d

23

276, 280 (D.D.C. 2005) in concluding that, "[e]ven though *Walker Process* claims are predicated

24

_____

25

[5] Defendants argue that the Ninth Circuit in fact has held that only potential competitors
who are ready to enter the market have standing to bring *Walker Process* claims.  *Bourns, Inc. v.

26

Raychem Corp.*, 331F.3d 704, 711-12 (9th Cir. 2003).  However, *Bourns* did not present the

27

issue that is before this Court.  *See In re Netflix Antitrust Litigation*, 506 F. Supp. 2d 308, 315-16
(N.D. Cal. 2007) ("The *Bourns* decision did not squarely address the question of consumer

28

standing.")

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

on enforcement of a fraudulently-obtained patent, the harm still accrues directly to consumers. . .

. Accordingly, if plaintiffs can plead the other elements of their *Walker Process* claim, they have

standing."[6] Ritz maintains that the policy underlying *Walker Process* claims is to redress

anticompetitive conduct, and that, "[i]t would be perverse to deny standing to the main targets of

[such] conduct." Opp. Br. at 21.

Defendants argue that Ritz overlooks persuasive authority holding that purchaser

plaintiffs lack standing.  According to Defendants, it is generally accepted that consumers lack

standing to assert a *Walker Process* claim unless the patent at issue is "already unenforceable

due to inequitable conduct."  MTD at 19 (quoting *In re DDAVP*, 585 F.3d 677 at 691-92); *See*

*also Kroger Co. v. Sanofi-Aventis*, 701 F. Supp. 2d 938 (S.D. Ohio 2010); *Kaiser Foundation*

*Health Plan, Inc., v. Abbott Laboratories, Inc.*, No. CV 02-2443-JFW, 2009 WL 3877513, at *4

(C.D. Cal. Oct. 8, 2009); *In re K-Dur Antitrust Litigation*, No. 01-1652 (JAG), MDL No. 1419,

2007 WL 5297755 (D.N.J. Mar. 1, 2007); *In re Ciprofloxacin Hydrochloride Antitrust*

*Litigation*, 363 F. Supp. 2d 514, 542 (E.D.N.Y. 2005); *In re Remeron Antitrust Litigation*, 335 F.

Supp. 2d 522 (D.N.J. 2004); *Asahi Glass Co. v. Pentech Pharms, Inc.*, 289 F. Supp. 2d 986

(N.D. Ill. 2003).

However, many of these cases involve issues not presented here.  In *Kroger*, the patent at

issue already had been found valid in prior litigation.  701 F. Supp. 2d at 963 ("The Court is

loathe to grant such an expansion of potential patent challengers by conferring standing to direct

purchasers of a drug for which the patent has been judicially determined to be valid and

enforceable.").  In *Kaiser*, the court dismissed the plaintiff's *Walker Process* claim because of

the indirect nature of the alleged antitrust injury.  2009 WL 3877513, at *4 ("it is clear that the

injury allegedly suffered by Plaintiff in its Hatch-Waxman *Walker Process* claim is not the type

of 'direct' or 'proximate' injury that results in antitrust standing.").  Likewise, *In re K-Dur*, *In re*

---

[6] Defendants seek to distinguish *Netflix* by arguing that it turned on the question of antitrust injury, and that its discussion of consumer standing was *dicta*. MTD at 19 n. 6. However, this Court agrees with Ritz that the question of standing was germane to the resolution of the case. Opp. Br. at 17.  Indeed, the court could not have reached the issue of antitrust injury without finding that the plaintiffs had standing to pursue a *Walker Process* claim.

5

1   *Ciprofloxacin*, and *Asahi* each involved a *Walker Process* claim brought by an indirect

2   purchaser.  Here, Ritz is a direct purchaser of NAND flash memory, and the validity of the

3   patents at issue has never been resolved.

4        The Supreme Court's decision in *Walker Process* places no limitation on the class of

5   plaintiffs eligible to bring a *Walker Process* claim,[7] and only one court has held expressly that a

6   direct purchaser lacks standing to sue.[8]  Even in *DDAVP*, the Second Circuit declined to decide

7   "whether purchaser plaintiffs *per se* have standing to raise *Walker Process* claims." 585 F.3d at

8   691-92.  The court specifically limited its holding to the facts presented, deciding only that it is

9   acceptable for consumers to bring a *Walker Process* claim when the relevant patent already has

10  been tarnished by a finding of inequitable conduct.

11       In this case, the plaintiffs are challenging an already tarnished patent. We are able
         to grant them antitrust standing without altering the typical limits on who can start
12       a challenge to a patent's validity.  We therefore hold only that purchaser plaintiffs
         have standing to raise *Walker Process* claims for patents that are already
13       unenforceable due to inequitable conduct.

14  585 F.3d at 691-92

15       Ritz argues that the patents at issue in this case have been tarnished by this Court's own

16  determination in the SanDisk-STM litigation that there were triable issues of fact as to whether

17  SanDisk procured the patents by fraud.  *See* Order Granting in Part and Denying in Part

18  Plaintiff's Motion for Summary Judgment, *SanDisk Corp. v. STMicroelectronics, Inc., et al.*, No.

19  C 04-4379-JF, Dkt. 273 at 7-13.[9]  Defendants are correct that a denial of a motion for summary

20  judgment is not tantamount to a finding of inequitable conduct.  However, because of the

21

22       [7] 382 U.S. at 176.

23       [8] *In re Remeron*, 335 F. Supp. 2d 522 at 529 ("*Walker Process* and its progeny involve
24  antitrust counterclaimants who were potential or actual competitors in patent infringement suits.
     In this case, . . . Plaintiffs were not party to the initial patent infringement suits. . . Accordingly,
25  this Court finds that Plaintiffs do not have standing to assert Walker Process fraud claims . . .").

26       [9] Case No. C 04-4379-JF was one of two actions brought by SanDisk against STM
     alleging infringement of the '338 and '517 patents, respectively.  In that action, STM brought a
27  *Walker Process* counterclaim identical to the claim asserted by Ritz in this case.  On summary
     judgment, the Court held that the counterclaim was supported by sufficient evidence to proceed
28  to trial.

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

1   heightened evidentiary requirements necessary for a showing of fraud, few *Walker Process*

2   claims survive summary judgment.  Those that do raise at least some question as to the validity

3   of the subject patent.

4         Citing *DDAVP*, Defendants argue that, "giving *Walker Process* standing to . . . [direct

5   purchaser] plaintiffs . . . could result in an avalanche of patent challenges, because direct

6   purchasers otherwise unable to challenge a patent's validity could do so simply by dressing their

7   patent challenge with a *Walker Process* claim."  585 F.3d at 691 (discussing concerns raised by

8   Defendants).  However, because viable *Walker Process* claims are rare, it is unlikely that many

9   direct purchasers will be in the same position as Ritz is here.  Moreover, as the Supreme Court

10   observed in *Walker Process*, "the interest in protecting patentees from 'innumerable vexatious

11   suits' [may not] be used to frustrate the assertion of rights conferred by the antitrust laws."  382

12   U.S. at 176 (quoting *Mowry v. Whitney*, 81 U.S. 434, 441 (1871)).

13         Having concluded that Ritz has *Walker Process* standing, the Court now must determine

14   whether Ritz has met the pleading requirements of Fed. R. Civ. P. 9(b), and whether the alleged

15   anticompetitive conduct is sufficient to show a cognizable antitrust injury.

16   **B.  Fraudulent Procurement**

17         "The first barrier for a *Walker Process* claimant to clear is the requirement that the patent

18   be obtained through actual fraud upon the PTO.  This question is governed by Federal Circuit

19   law."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) (citing *Nobelpharma*

20   *AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed.Cir.1998) (*en banc* in relevant part)).

21   A successful *Walker Process* plaintiff must show that: (1) the patent at issue was procured by

22   knowing or willful fraud on the USPTO; (2) the defendant was aware of the fraud when

23   enforcing the patent; (3) there is independent evidence of a clear intent to deceive the examiner;

24   (4) there is unambiguous evidence of reliance, *i.e.*, that the patent would not have issued but for

25   the misrepresentation or omission; and (5) the necessary additional elements of an underlying

26   violation of the antitrust laws are present.  *Nobelpharma*, 141 F.3d at 1068-71; *see also In re*

27   *Netflix*, 506 F. Supp. 2d at 314.

28         Ritz alleges that in obtaining the crown jewel patents, SanDisk made affirmative

7

misrepresentations to the USPTO and deliberately withheld material information, including key prior art, during reexamination of the '338 patent in 1996. FAC ¶¶ 35-73, 126, 132. Ritz claims that SanDisk intentionally mischaracterized the patent as describing a method for permanent inhibition of electrically erasable programmable read only memory ("EEPROM") in an effort to avoid invalidation by prior art.[10]  *Id.* ¶ 44. As evidence that its patent described permanent inhibition, SanDisk referred to Latch 721–a one-way resettable latch featured in a diagram in the '338 patent. *Id.* Ritz alleges that the USPTO relied on Latch 721 in determining that the '338 patent claimed permanent inhibition and was unaware that the inventors of the patent had published an article describing Latch 721 as a two-way data latch. *Id.* ¶¶ 45-46. Ritz also alleges that the law firm responsible for prosecuting both crown jewel patents began keeping a record of prior invalidating art months before the 1996 reexamination but failed to disclose this fact to the USPTO. *Id.* ¶ 51. Ritz asserts that had the USPTO been aware of the prior art, the '338 patent would not have survived reexamination and the claims of the '517 patent would not have issued as written. *Id.* ¶ 54. Finally, Ritz alleges that neither patent would have issued in the first instance had the USPTO known that the applications were based upon stolen technology. *Id.* ¶ 72. Taken together, these allegations describe a clear deceptive intent that was present from the time Defendants first applied for the crown jewel patents. Moreover, they suggest that misrepresentations and omissions played a key role in the USPTO's determinations.

## C. Anticompetitive Conduct

"Fraudulent acquisition of the asserted patent . . . is the beginning, not the end, of the inquiry. [*Walker Process* claimants] must also show the basic elements of an antitrust violation defined by the regional circuit's law, including that the patentee's behavior was directed to a relevant product market." *Dippin Dots*, 476 F.3d 1337 at 1348 (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc*., 375 F.3d 1341, 1363 (Fed.Cir.2004), *rev'd on other grounds*, 546 U.S. 394 (2006)).

---

[10] The reexamination centered on whether the '338 patent had been preempted by a 1983 article that discussed an incremental method for programming EEPROM known as temporary inhibition. *Id.* ¶ 43.

1

2 **1. Relevant Market**

3    The Supreme Court has explained that the relevant market for antitrust purposes is

4 determined by the choices available to consumers. *Eastman Kodak Co. v. Image Technical*

5 *Services, Inc.*, 504 U.S. 451, 482 (1992).  "The product market includes the pool of goods or

6 services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka*

7 *v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001).  Put differently,

8 products may be considered a part of the same market when "consumers view [them] as

9 reasonable substitutes for each other and would switch among them in response to changes in

10 relative prices." *Apple, Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008).

11    Ritz alleges that Defendants possess monopoly power within the market for raw and

12 finished NAND flash memory products.  FAC ¶ 25.  Defendants claim that this all-encompassing

13 definition is inappropriate because it includes products that are not reasonably interchangeable,

14 such as the flash memory used in digital camera storage and that used in computer hard drives.

15 However, the Ninth Circuit has observed that, "[d]efinition of the relevant market cannot be

16 performed with mathematical accuracy; it is simply the recognition of a field in which

17 meaningful competition is said to exist." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.

18 1997).   The definition need not be pled with specificity, and "[o]rdinarily, the relevant market is

19 a question of fact for the jury." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d

20 1484, 1489 (9th Cir. 1991); *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045

21 (9th Cir. 2008).  Ritz claims that there are no substitutes for NAND flash memory to which

22 consumers would switch in response to an increase in price.  FAC ¶ 25.  At the pleading stage,

23 this is sufficient.

24 **2. Antitrust Standing**

25    "Only individuals who possess antitrust standing by virtue of having suffered such injury

26 may sue to redress an antitrust violation." *In re Webkinz Antitrust Litigation*, 695 F. Supp. 2d

27 987, 996 (N.D. Cal. 2010) (citing *Associated General Contractors of California, Inc. v.*

28 *California State Council of Carpenters*, 459 U.S. 519, 529-535 (1983)).  In the Ninth Circuit,

9

1   antitrust standing is dependent upon: "(1) the nature of the plaintiff's alleged injury; that is,

2   whether it was the type the antitrust laws were intended to forestall; (2) the directness of the

3   injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the

4   complexity in apportioning damages." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir.1996)

5   (citing *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983))."

6   Having alleged an injury that stems from unfair product overcharges, Ritz plainly has identified

7   the measure of the harm.  There is little risk of duplicative recovery, as might be the case when

8   "every person along a chain of distribution [is permitted] to claim damages arising from a single

9   transaction that violated the antitrust laws." *Blue Shield of Virginia v. McCready*, 457 U.S. 465,

10  475 (1982).  The purported class is limited to direct purchasers of raw and finished NAND flash

11  memory purchased from SanDisk after June 25, 2006.  FAC ¶ 19.  This limitation is sufficient at

12  the pleading stage to address the fifth factor in the standing analysis.

13       The most difficult question is whether Ritz has alleged a cognizable antitrust injury.  An

14  antitrust plaintiff must allege: "(1) unlawful conduct, (2) causing an injury to plaintiffs, (3) that

15  flows from that which makes the conduct unlawful, (4) that is of the type the antitrust laws were

16  intended to prevent . . .[and] (5) that the injured party be a participant in the same market as the

17  alleged malefactors." *Glen Holly Ent'mt., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th

18  Cir.2003) (internal citations omitted).  As a direct purchaser of raw and finished NAND flash

19  memory, Ritz properly may be considered a participant in the same market as Defendants.  *See

20  In re Netflix*, 506 F. Supp. 2d at 315 (finding that purchasers of defendant's product are

21  participants in the same market).

22                                **a. Tortious Conversion**

23       Ritz alleges that Harari tortiously converted NAND flash memory technology belonging

24  to his former employer, WSI, and used it to obtain the crown jewel patents.  FAC ¶¶ 93-102,

25  126, 132.  It claims that but for the assertion of fraudulent patents, SanDisk's competitors would

26  not have been driven from the market.  Defendants argue that this alleged conduct cannot give

27  rise to a cognizable antitrust injury because, "theft of a perfectly valid patent . . . creates no

28  monopoly power; it merely shifts a lawful monopoly into different hands." *Brunswick Corp. v.*

                                          10

*Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984). However, this argument assumes the validity of the patents at issue, which would be inappropriate at the pleading stage in light of Ritz's *Walker Process* claim.

### b. Customer Threats and Sham Litigation

Ritz alleges that after fraudulently procuring the crown jewel patents, Defendants sought to enforce the patents through baseless infringement actions that caused STM to exit the market in March 2008 and prevented STM from forming a competitive joint venture with Hynix, a leading semiconductor manufacturer.[11] FAC ¶¶ 110-122, 126, 132. As part of the campaign against STM, Defendants allegedly sought to drive away STM's customers by serving them with document and deposition subpoenas. *Id.* ¶ 110. Defendants resolved the STM litigation in 2009 through a confidential settlement that allegedly precluded STM from re-entering the relevant market and further cemented Defendants' monopoly.[12] *Id.* ¶¶ 112-120, 126, 132.

In addition, Defendants allegedly threatened their competitors' customers by warning that, "SanDisk will force them to purchase flash memory at disadvantageous prices and terms if they are later required to turn to SanDisk to purchase the necessary flash memory for their products." *Id.* ¶¶ 8, 110. As noted previously, Defendants terminated their supply contract with Ritz shortly after the instant lawsuit was filed. *Id.* ¶¶ 111, 126, 132.

For several reasons, Defendants argue that these allegations fall short. First, they point out that Ritz does not allege that any customers actually were driven away from competitors by Defendants' alleged threats. However, it is well established that threats alone are an inherent injury to competition. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570 (1966) (affirming lower court finding of *per se* violation of the Sherman Act based on competitor intimidation); *Bourns, Inc. v. Raychem Corp*, 331 F.3d 704 at 712 (suggesting that antitrust injury would have existed if

---

[11] Ritz alleges also that Defendants unlawfully asserted the '338 patent against Samsung Corporation ("Samsung") in 1996, which led to the reexamination of the patent later that year. FAC ¶¶ 41-46.

[12] The settlement resolved all state and federal litigation between SanDisk and STM. *Id.* ¶ 112.

1   threats were addressed to competitors).

2          Second, Defendants claim that judicially noticeable facts show that they did not force

3   STM from the market or thwart its prospective joint venture with Hynix.  According to

4   Defendants, STM made numerous SEC filings throughout its litigation with SanDisk in which it

5   discussed the minimal risk posed by SanDisk's suits.  Exs. G, H to Defendants' Request for

6   Judicial Notice ("RJN").  They also point to additional SEC filings that allegedly prove that

7   STM did not exit the market in 2008 but instead transferred its business to a joint venture with

8   Intel Corporation, and to a November 2004 report to the SEC indicating that STM in fact entered

9   into a joint venture with Hynix.  RJN Exs. B-D.

10          Defendants observe correctly that the Court need not "accept as true allegations which

11   are contradicted by documents which are properly considered on a motion to dismiss."  *In re

12   Visx, Inc. Sec. Litigation*, Nos. C 00-0649 CRB, C-00-0815 CM, 2001 WL 210481, *7 n.1 (N.D.

13   Cal. Feb. 27, 2001) (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir.

14   1998)). They also note that at least one other court in this district expressly took judicial notice

15   of SEC filings in the context of a motion to dismiss.  *Ice Cream Distribs. of Evansville, LLC v.

16   Dreyer's Grand Ice Cream, Inc.*, No. 09-5815 CW, 2010 Lexis 52985, at * 2-3 n.2 (N.D. Cal.

17   May 28, 2010).  However, while a court may take judicial notice of the *existence* of SEC filings,

18   it may not take judicial notice of documents for the truth of disputed facts asserted therein.  *See*

19   Fed. R. Evid. 801(c); *Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005)

20   ("SEC filings 'should be considered only for the purpose of determining what statements the

21   documents contain, not to prove the truth of the documents' contents.") (quoting *Lovelace v.

22   Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)).  In *Ice Cream Distributors*, the

23   court took judicial notice of SEC filings not to rebut the plaintiff's allegations but in order to

24   verify the defendant's corporate hierarchy.  2010 Lexis 52985, at *2-3 n.2.  This Court declines

25   to take judicial notice of the hearsay statements contained in the SEC filings at issue here.

26

27

28

12

Third, Defendants argue that the *Noerr-Pennington*[13] doctrine shields them from any liability arising from their litigation with STM or from litigation-related correspondence with STM customers.  The *Noerr-Pennington* doctrine affords immunity from antitrust liability to citizens who petition the government for redress of grievances, including when they seek relief in the courts.  "[C]onduct incidental to the prosecution of [a] suit" also is protected.  *Columbia Pictures Indus., Inc., v. Prof'l Real Estate Investors, Inc.,* 944 F.2d 1525, 1528-29 (9th Cir. 1991) *aff'd* 508 U.S. 49 (1993).  However, there are two recognized exceptions to this doctrine: (1) where a party engages in a "sham"petition intended only to "interfere directly with the business relationships of a competitor," or (2) where an asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*.  *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972).

Defendants contend that Ritz cannot rely on the "sham" exception to *Noerr-Pennington* because this Court granted summary judgment in favor of SanDisk on this precise issue in the SanDisk-STM litigation.  No. C 04-4379-JF, Dkt. 273 at 15 ("The Court agrees that the results of the ITC investigations prevent a finding of sham litigation.").  Ritz suggests that the outcome would have been different if the Court had analyzed the suit as part of an overall pattern of infringement actions.  It claims that a different test is required where a plaintiff alleges that the defendant engaged in a "whole series of lawsuits" intended to quash competition.  *USS-POSCO Indus. v. BE&K*, 31 F.3d 800, 810-11 (9th Cir. 1994) ("When dealing with a series of lawsuits, the question is not whether any one of them has merit . . . but whether they [were] brought . . . not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?").  However, these arguments ultimately are immaterial, because Defendants' alleged conduct clearly comes within the second exception to the *Noerr-Pennington* doctrine.

Finally, Defendants contend that speculative allegations of an anticompetitive settlement

---

[13] *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

1    with STM do not suffice to state an antitrust injury.  Ritz argues that even under the

2    "plausibility" standard articulated in *Bell Atl. Corp. v. Twombly* plaintiffs alleging an unlawfully

3    anticompetitive settlement agreement only are required to plead facts suggesting a "reasonable

4    expectation" of wrongful conduct.  Here, Ritz alleges that the patents were fraudulently obtained

5    and that the settlement agreement entered between SanDisk and STM ratified STM's forced exit

6    from the NAND flash memory market.  Ritz expects that discovery will reveal further evidence

7    of an illegal agreement.

8         Defendants point out that "the settlement of patent litigation, in and of itself, does not

9    violate the antitrust laws."  *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th

10   Cir. 1976).   "[T]he question is whether the underlying infringement lawsuit was objectively

11   baseless. . ." *In re Tamoxifen Citrate Antitrust Litigation*, 466 F.3d 187, 213 (2d Cir. 2006)

12   (internal citations omitted).  However, if the patents asserted against STM were procured by

13   fraud, there is a plausible inference that the purpose of the resulting settlement agreement was to

14   extend Defendants' alleged monopoly.  The Court concludes that Ritz has pled sufficient facts to

15   establish an antitrust injury.[14]

16   **D.  Conspiracy to Monopolize**

17        Defendants claim that Count I of the FAC, which alleges conspiracy to monopolize, is

18   subject to dismissal because as a matter of law SanDisk and Harari could not have formed a

19   conspiracy with each other.  *Copperweld Corp. v.  Independence Tube Corp.*, 467 U.S. 752, 777

20   (1984) (holding that a parent corporation and its wholly-owned subsidiary "are incapable of

21   conspiring with each other for purposes of § 1 of the Sherman Act" because a parent and its

22   wholly-owned subsidiary have a "complete unity of interest."); *See, e.g., Levi Case Co., Inc. v.*

23   *ATS Prods., Inc.,* 788 F. Supp. 428, 430-32 (N.D. Cal. 1992) (extending *Copperweld* to § 2 of

24   the Sherman Act).

25        Ritz argues that *Copperweld* does not apply because Harari committed the improper

26

27        [14] Defendants argue that their refusal to deal with Ritz is a legitimate business decision,
     rather than anticompetitive behavior.  Such factual disputes are not subject to resolution on a
28   motion to dismiss.

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)

1 | conduct underlying the alleged conspiracy months before he founded SanDisk.  FAC ¶¶ 94-96,

2 | 103 (alleging Harari filed initial patent applications based on misappropriated technology in

3 | April 1989, and founded SanDisk in June 1989).  However, Ritz concedes in its opposition brief

4 | that the "June 1989" date is erroneous and that Harari founded SanDisk in June 1988.  Opp. Br.

5 | at 4 n.1. In light of this concession, this aspect of Defendants' motion is well-taken.

6 | **IV. ORDER**

7 | Having previously determined that triable issues of fact exist with respect to whether the

8 | crown jewel patents were procured fraudulently, the Court concludes that Ritz is entitled to

9 | pursue a *Walker Process* claim against Defendants.  The Court also concludes that Ritz has pled

10 | fraudulent conduct and harm to competition with sufficient particularity and that Ritz has failed

11 | as a matter of law to state a claim for conspiracy to monopolize.  Good cause therefor appearing,

12 | Defendants' motion to dismiss will be GRANTED IN PART, WITHOUT LEAVE TO AMEND

13 | as to Count I, and otherwise will be DENIED.  Defendants' request for judicial notice also will

14 | be DENIED.

16 | DATED: February 24, 2011

17 | _____
JEREMY FOGEL
United States District Court

15

Case No. 5:10-cv-02787-JF/HRL
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT
(JFLC1)