1  Colleen Duffy-Smith (CA Bar No. 161163)
   MORGAN DUFFY-SMITH & TIDALGO LLP
2  1960 The Alameda, Suite 220
   San Jose, CA 95126
3  (408) 244-4570
   cduffysmith@mdstlaw.com

4  [Additional counsel on
   signature page]
5

6  *Attorneys for Plaintiffs*

7

8                   UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                        (OAKLAND DIVISION)

10 _____ )
11 ALFRED T. GIULIANO, Chapter 7       )
   Trustee of the Ritz Estate, on Behalf )   **CASE NO. CV 10-02787-SBA**
   of the Ritz Estate; CPM Electronics Inc.; )
12 E.S.E. Electronics, Inc.; and       )
   MFLASH, Inc.,                       )
13                                     )
   On Behalf of Themselves and         )   **NOTICE OF MOTION AND**
14 All Others Similarly Situated,      )   **MOTION TO CERTIFY CLASS AND FOR**
                                       )   **APPOINTMENT OF CLASS COUNSEL**
15                                     )   **AND MEMORANDUM IN SUPPORT**
                                       )
16                    Plaintiffs,      )
                                       )
17          v.                         )   **Hearing Date: December 1, 2014**
                                       )   **Time: 1:00 p.m.**
18 SANDISK CORPORATION                 )   **Courtroom: 1, Oakland**
                                       )   **Judge: Hon. Saundra B. Armstrong**
19                    Defendant.       )
   _____ )

20          **NOTICE OF MOTION AND MOTION TO CERTIFY CLASS**
21              **AND FOR APPOINTMENT OF CLASS COUNSEL**

22          PLEASE TAKE NOTICE THAT on December 1, 2014, at 1:00 p.m., at the above-entitled

23 Court, located at 1301 Clay Street, Oakland, California, in the courtroom of Hon. Saundra Brown

24 Armstrong, Plaintiffs Alfred T. Giuliano, Chapter 7 Trustee of the Ritz bankruptcy estate ("Trustee");

25 CPM Electronics Inc. ("CPM"); E.S.E. Electronics, Inc. ("E.S.E."); and MFLASH, Inc.

26 ("MFLASH") (collectively, "plaintiffs"), will and hereby do move the Court for an order (1) pursuant

27

28 **Motion To Certify Class and for**                          **Case No. CV 10-02787-SBA**
   **Appointment of Class Counsel and**
   **Memorandum in Support**

1   to Rule 23(c) of the Federal Rules of Civil Procedure certifying this case as a class action;

2   (2) appointing the plaintiffs identified above as class representatives; and (3) appointing the firms

3   Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. ("KHHTEF"), Berry Law, and Stueve Siegel

4   Hanson LLP ("SSH") as class counsel, and Morgan Duffy-Smith & Tidalgo LLP ("MDST") as

5   liaison counsel for the class.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Motion To Certify Class and for**                                                    **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

1
2

# TABLE OF CONTENTS

3

**Page**

4   MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

5   PROPOSED CLASS TO BE CERTIFIED ......................................................................... 2

6   BACKGROUND ......................................................................................................... 3

    ARGUMENT ............................................................................................................. 7

7   CONCLUSION ......................................................................................................... 15

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Motion To Certify Class and for**                    i                    **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aftermarket Auto. Lighting Prods. Antitrust Litig., In re,*
    276 F.R.D. 364 (C.D. Cal. 2011) ................................................................. 15

*Amgen Inc. v. Connecticut Ret. Plan & Trust Funds,*
    133 S. Ct. 1184 (2013) .............................................................................. 8

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796 (7th Cir. 2013) ..................................................................... 14

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
    157 F.3d 1340 (Fed. Cir. 1998) .................................................................. 9

*Catfish Antitrust Litig., In re,*
    826 F. Supp. 1019 (N.D. Miss. 1993) ........................................................ 11

*Consolidated Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995) ........................................................................ 9

*Electronic Books Antitrust Litig., In re,*
    No. 11 Md 2293(DLC), 2014 WL 1282293 (S.D.N.Y. March 28, 2014) ............ 14

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    131 S. Ct. 2179 (2011) ............................................................................. 12

*Herrera v. LCS Fin. Servs. Corp.,*
    274 F.R.D. 666 (N.D. Cal. 2011) ............................................................... 8

*High Tech. Careers v. San Jose Mercury News,*
    996 F.2d 987 (9th Cir. 1993) ..................................................................... 9

*High-Tech Emp. Antitrust Litig., In re,*
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................................... 8

*Image Tech. Serv., Inc. v. Eastman Kodak Co.,*
    903 F.2d 612 (9th Cir. 1990) ..................................................................... 9

*Levya v. Medline Indus. Inc.,*
    716 F.3d 510 (9th Cir. 2013) ..................................................................... 14

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
    244 F.3d 1152 (9th Cir. 2001) ................................................................... 12

**Motion To Certify Class and for**
**Appointment of Class Counsel and**
**Memorandum in Support**
        ii
        **Case No. CV 10-02787-SBA**

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................. 7

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ........................................................................... 12

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998) ......................................................................... 9

*Rail Freight Fuel Surcharge Antitrust Litig., In re*,
  287 F.R.D. 1 (D.D.C. 2012) ............................................................................. 14

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
  700 F.3d 503 (Fed. Cir. 2012) ........................................................................... 2

*SanDisk Corp. v. STMicroelectronics, Inc.*,
  No. C 04-4379, 2008 WL 4615605 (N.D. Cal. Oct. 17, 2008) ......................... 1

*Simpson v. Fireman's Fund Ins. Co.*,
  231 F.R.D. 391 (N.D. Cal. 2005) ..................................................................... 11

*Static Random Access (SRAM) Antitrust Litig., In re*,
  No. C 07-01819, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ........ 11, 12, 13, 15

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ........................................................................... 11

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
  252 F.R.D. 213 (D. Del. 2008) ........................................................................ 11

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
  209 F.R.D. 159 (C.D. Cal. 2002) ..................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ....................................................................................... 9

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) ............................................................... 1, 2, 4, 9, 12, 14

*Zinser v. Accufix Res. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001), *amended by* 273 F.3d 1266 ........................... 7

**Motion To Certify Class and for**                iii                **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

1

## STATUTES & RULES

2   15 U.S.C. § 2 (Sherman Act) ........................................................................... 1, 4

3   Fed. R. Civ. P. 23(a) .......................................................................................... 7, 9

4   Fed. R. Civ. P. 23(a)(3) .......................................................................................... 11

5   Fed. R. Civ. P. 23(a)(4) .......................................................................................... 11

6   Fed. R. Civ. P. 23(b)(3) ............................................................................. 8, 12, 15

7

## OTHER AUTHORITIES

9   *Certain NOR and NAND Flash Memory Devices and Products Containing Same*,
        USITC Inv. No. 337-TA-560 (2006) ...................................................... 7

10  U.S. Patent No. 5,172,338 ........................................................................... 4

11  U.S. Patent No. 5,991,517 ........................................................................... 6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Motion To Certify Class and for**                    iv                    **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs, like all members of the class they seek to represent, are direct purchasers of flash memory products from defendant SanDisk Corporation.  SanDisk is a major player in the worldwide market for flash memory.  SanDisk did not achieve this position solely by developing, manufacturing, and selling its own products.  Throughout the company's history, SanDisk's enforcement of its intellectual property has contributed significantly to the company's revenues and its success.  Ex. A, Sullivan Attach. C-1.  But not all of that intellectual property was rightly SanDisk's to enforce.  In the 1990s, SanDisk procured two patents critical to its portfolio (the '338 and '517 patents) by intentionally deceiving the United States Patent and Trademark Office ("PTO") about whether the inventions described in the patents were truly novel and therefore entitled to protection.  SanDisk then used its fraudulently obtained patents to extract licensing agreements (and royalty payments) from its competitors in the flash memory business.  By raising its rivals' costs, SanDisk also forced those rivals to raise prices on their flash memory products; SanDisk then raised its own prices and pocketed the overcharge.  SanDisk's improper monopolization of the flash memory market through enforcement of fraudulent patents is a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  *See Walker Process Equip.*, *Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

The threshold merits of plaintiffs' claims have been twice affirmed by the federal courts.  In 2008, Judge Fogel denied summary judgment to SanDisk when another party, STMicroelectronics, Inc. ("STM"), asserted the same *Walker Process* fraud claim that plaintiffs raise here; Judge Fogel determined that there was both "sufficient evidence to preclude summary judgment regarding the materiality of [SanDisk's] alleged misrepresentations and omissions with respect to both the '338 and '517 patents" and "sufficient evidence of intent to support . . . the claim."  *SanDisk Corp. v. STMicroelectronics, Inc.*, No. C 04-4379, 2008 WL 4615605, at *6-8 (N.D. Cal. Oct. 17, 2008).  Ex. B.  SanDisk settled with STM soon after Judge Fogel issued that ruling, but plaintiffs now seek to hold SanDisk accountable for its fraudulent conduct.

---

**Motion To Certify Class and for**
**Appointment of Class Counsel and**
**Memorandum in Support**                                        1                          **Case No. CV 10-02787-SBA**

In an interlocutory appeal in this case, the Federal Circuit confirmed that plaintiffs' "status as . . . direct purchaser[s] give[ them] standing to pursue [their] *Walker Process* claim" against SanDisk. *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 508 (Fed. Cir. 2012) Ex. C. The Federal Circuit held "that direct purchasers are not only eligible to sue under the antitrust laws, but have been characterized as 'preferred' antitrust plaintiffs." *Id*. at 506-07.

Plaintiffs' standing to bring this *Walker Process* claim was supported by the United States Department of Justice and the Federal Trade Commission (Ex. D), thirty-five states, including California (Ex. E), and twenty-seven U.S. antitrust, intellectual property, and innovation professors (Ex. F). Indeed, the Department of Justice and Federal Trade Commission noted that "Ritz has alleged precisely the type of injury the antitrust laws were designed to redress." Ex. D at 7.

The next step is to certify this litigation as a class action. Class treatment is particularly appropriate here. SanDisk's fraud affected hundreds of its direct purchasers in exactly the same way; the merits of these purchasers' claims are subject to common proof and a single damages model. SanDisk has no serious contention that class certification is not proper.

## PROPOSED CLASS TO BE CERTIFIED[1]

Plaintiffs Alfred T. Giuliano, as Trustee to the Ritz Estate, E.S.E., CPM, and M-FLASH are direct purchasers of final flash products from SanDisk. They bring this action on behalf of themselves and a proposed class defined as: All persons and entities residing in the United States who, on or after July 1997, directly purchased from SanDisk, or from its controlled and licensed joint venture with Toshiba Corporation, final flash products. Such products include, without limitation, those that SanDisk sold to retail firms, OEMs, and distributors. Purchases of final flash products that

---

[1] The current operative complaint is plaintiffs' Third Amended Complaint. *See* Dkt. Nos. 148, 150. In December 2013, plaintiffs sought leave to file a Fourth Amended Complaint to modify the class and market allegations and add a representative plaintiff, M-FLASH. *See* Dkt. No. 158. Plaintiffs later sought leave to modify the Court's scheduling order and substitute the proposed Fourth Amended Complaint with a modified Fourth Amended Complaint. *See* Dkt. No. 207. Both motions are fully briefed and remain pending. For purposes of this brief, plaintiffs rely on the proposed class definitions, as well as the other allegations, in their proposed modified Fourth Amended Complaint. If the Court ultimately denies leave to amend, plaintiffs respectfully reserve the right to seek supplemental class certification briefing on the complaint the Court deems operative.

Motion To Certify Class and for                        2                        Case No. CV 10-02787-SBA
Appointment of Class Counsel and
Memorandum in Support

1  contain a microcontroller—a semiconductor that interfaces with electronic equipment and operates

2  the flash memory—are included in the class.  Purchases of flash memory combined with dynamic

3  random access memory ("DRAM"), flash memory combined with static random access memory

4  ("SRAM"), or flash memory combined with a microprocessor ("system on a chip") are excluded

5  from the class.[2]

6  **BACKGROUND**

7  *Flash Memory.*  This case involves a technology known as flash memory.  Flash memory is a

8  type of electrically erasable programmable read-only memory ("EEPROM") that is used in a variety

9  of applications, including solid-state hard drives, USB flash drives, memory cards for digital cameras

10  and other devices, and embedded storage in devices such as mobile phones.  Ex. A, Report of Ryan

11  Sullivan, Ph.D. ("Sullivan") ¶¶ 27, 31.  Flash memory is non-volatile, meaning that data is not lost

12  when there is no power.  *Id.* ¶ 27.  This case involves one type of flash memory, known as NAND,

13  which is currently the mainstream technology for flash storage.  *Id.* ¶¶ 37-38.  NAND flash memory

14  stores data in an array of memory cells; the data in the cells is programmed or erased by applying

15  electrical voltage to give the cell a particular charge state that represents a value.  NAND cells can be

16  either single-level cells ("SLC") or multi-level cells ("MLC").  An SLC has only two possible charge

17  states and therefore stores one bit of data—that is, either a 1 or a 0—depending on the charge.  An

18  MLC can store multiple bits of data.  For example, a 2-bit MLC has four charge states and therefore

19  stores two bits of data; depending on the state, the cell reflects either 00, 01, 10, or 11.  *Id.* ¶¶ 34.

20  Arrays of NAND cells (whether SLC or MLC) are placed on flash memory chips during

21  fabrication; these chips can be in wafer form (on uncut, circular disks of semiconductor material); die

22  form (the wafer cut into separate dice); packaged die form (the cut die placed into a package for

23  connection to a printed circuit board); or bumped die form (the cut die with material added that

24  allows the die to be connecting directly to a printed circuit board).  Dkt. No. 207-2 ¶ 2.  These chips

25  can be combined with additional components, software, or firmware to make final flash products

26  ───────────────
[2] The Third Amended Complaint also discusses a class of U.S. direct purchasers of raw chips from

27  SanDisk, rather than final flash products.  Plaintiffs do not seek to certify this class at this time.

28  **Motion To Certify Class and for**                    3                    **Case No. CV 10-02787-SBA**
   **Appointment of Class Counsel and**
   **Memorandum in Support**

(such as USB drives) that are eventually sold to consumers.  Or they can be sold to manufacturers who will incorporate them into such final flash products or into larger consumer electronics devices such as mobile phones or laptop computers.  Sullivan ¶¶ 30-31.  Examples of final flash products include solid state drives, memory cards, and USB storage chips.

*SanDisk's Fraudulent Patents.*  SanDisk is a self-described "global leader" in flash storage solutions.  Ex. G, SD 2013 10-K at 1.  Through a joint venture relationship with Toshiba, SanDisk manufactures NAND flash memory chips that it either (1) sells directly to manufacturers or retailers or (2) combines with other components into final flash products that are sold to retailers who will then sell them to consumers.  Sullivan ¶¶ 29-32.  SanDisk's flash memory business is bolstered by its intellectual property holdings.  SanDisk owns patents on aspects of flash memory and related technology, and it relies on these patents to manufacture and sell its own products; to force other flash memory manufacturers to enter license agreements in exchange for royalty fees; and to exclude any competitors to whom SanDisk has not granted a license.  *Id.* ¶ 51.

When a patent is lawfully obtained, the patent owner enjoys immunity for such monopolistic conduct, which would otherwise violate the antitrust laws.  But a patent procured by fraud is not entitled to the same protection; enforcing a fraudulently obtained patent to monopolize a market is a violation of Section 2 of the Sherman Act.  *See Walker Process*, 382 U.S. at 177.

The two SanDisk patents at issue in this case fall within this category.  SanDisk originally obtained the first of these two, U.S. Patent No. 5,172,338 ("the '338 patent"), in 1992.[3]  The '338 patent relates to MLC flash memory technology; its claims cover alleged "improvements in the circuits and techniques for read, write and erase of EEprom memory."  '338 Abstract.  In 1996, ███

████████████████████████████████████████████████████████████████

SanDisk filed a complaint in the United States International Trade Commission ("ITC") accusing Samsung of infringing the '338 and one other patent through its manufacture of NAND flash chips.

---

[3] Both patents at issue in this case expired in 2009 but were in force during the relevant class period.

Motion To Certify Class and for
Appointment of Class Counsel and
Memorandum in Support                     4                     Case No. CV 10-02787-SBA

While the ITC case was pending, both SanDisk and Samsung filed requests with the PTO to reexamine the '338 patent and confirm that it was properly issued.  Samsung argued that it was not; specifically, Samsung pointed to various documents that predated the priority date[4] of the '338 patent and that described the allegedly inventive "incremental inhibit" technology described in the '338 patent.  In response, SanDisk argued to the PTO that the '338 patent in fact described a different technology, known as "permanent inhibit," and that this "permanent inhibit" technology was not shown in the documents cited by Samsung and was therefore eligible for patenting.  Dkt. No. 207-2 ¶¶ 45-50.  As plaintiffs will demonstrate, however, SanDisk's arguments were fraudulent; SanDisk not only misrepresented what was disclosed in the '338 patent, it also knowingly withheld from the PTO an article written by one of the inventors of the '338 patent that confirmed the patent showed temporary inhibit, not permanent.  *Id.* ¶¶ 50, 70-77.  In addition, SanDisk knowingly withheld several relevant patents and patent applications that predated the '338 patent and which showed the "permanent inhibit" technology that SanDisk fraudulently claimed it had invented.  *Id.* ¶¶ 53-69.

Relying on SanDisk's misrepresentations, and without the benefit of the wrongfully withheld documents, the PTO confirmed the patentability of the '338 patent.  The ITC then determined that Samsung's NAND flash memory chips infringed the '338 patent and issued an exclusion order that would bar all of those chips from entering the country.  Shortly before the exclusion order was set to take effect, ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████ Sullivan ¶¶ 51, 62-64, 66, 69.

Meanwhile, SanDisk was pursuing before the PTO the application that ultimately issued in 1999 as U.S. Patent No. 5,991,517 ("the '517 patent").  Like the '338 patent, the '517 patent relates to alleged improvements in MLC flash memory systems and in the operation of those systems.

---

[4] A patent's priority date is the date upon which the patentability of the invention is judged; for example, if an alleged invention was described in a printed publication before the priority date, the inventor is not entitled to a patent.  A priority date may be the filing date of the patent application itself or the filing date of an earlier patent application to which the later application is entitled to claim priority under the patent laws.

1  '517 Abstract.  Unlike the '338 patent, the '517 indisputably describes the "permanent inhibit"

2  technology used in programming flash memory cells.  Dkt. No. 207-2 ¶ 52.  But SanDisk again

3  wrongfully withheld the earlier patents and patent applications showing that others had already

4  invented permanent inhibit; by concealing these documents from the PTO, SanDisk was able to

5  fraudulently procure another patent to wield against its competitors.  Dkt. No. 207-2 ¶¶ 56-69.

6          *SanDisk's Monopolistic Use of its Fraudulent Patents.*  SanDisk then began an anti-

7  competitive program to coerce its competitors to pay royalties on the fraudulent patents. ████

8  ████████████████████  As noted above, only after SanDisk defrauded the PTO to preserve the

9  '338 patent's validity—and to obtain an ITC exclusion order based solely on Samsung's alleged

10  infringement of the '338 patent—did ████████████████████████[5] ████████████

11  ████████████████████████████████████████████████████

12  ████████████████████  *See* Sullivan ¶ 74, n.158. ████████████████████

13  ████████████████████████████████ *Id.* ¶ 69. ████████████████

14  ████████████████████  *Id.* ¶ 69 & n.119. ████████████████████████

15  ████████████████  The '338 and '517 patents expired in 2009.  *Id.* ¶ 76.

16  ████████████████████████████████████████.  *Id.*  Thus,

17  while the market for flash chips increased 75% from 2008 to 2010, ████████████

18  ████████████████████████████████████.  *Id.* ¶ 77.

19          Other competitors followed ████████████.  Right after SanDisk defrauded the PTO and the

20  ITC ruled against Samsung, ████████████████████████████████

21  ████████████████████.[6]  Sullivan ¶ 63. ████████████████████

22  ─────────────────────────
     [5] The ITC also determined that Samsung had infringed another SanDisk patent, U.S. Patent No.

23  5,418,752, but Samsung successfully designed around this patent.  *See Certain Flash Memory Circuits and Products Containing Same*, USITC Inv. No. 337-TA-382 (1997).

24  [6] ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  Sullivan n.181.

28  **Motion To Certify Class and for**                    6                    **Case No. CV 10-02787-SBA**
     **Appointment of Class Counsel and**
     **Memorandum in Support**

1     ██████████████████████████████ *Id.* ¶ 69(b).  SanDisk subsequently licensed ████

2     ███████████████████████ Sullivan Attach. C-3.  And, in each case, SanDisk ██████

3     ████████████████████████████████████████████████████████████████

4     ████████████████████████████████████████████████

5     ███████████████████████████ Sullivan ¶ 73.[7]  By the end of these

6     licensing negotiations, SanDisk was receiving royalties and profits on ████████████

7     ████████████████████████████████.  *Id.* ¶ 58.

8         Because of SanDisk's enforcement of the fraudulent patents, its licensees incurred a higher

9     cost to produce final flash products between 1997 and 2009, in the form of a percentage royalty rate

10    on those flash products.  This, in turn, forced SanDisk's licensees to pass on this cost to their

11    customers in the form of higher prices.  *Id.* ¶¶ 88-91.  Because SanDisk and its licensees made up

12    ███████████ of the market, SanDisk was able to raise its own prices.  *Id.* ¶¶ 95-101. Essentially, if

13    all its licensees charged a higher price, SanDisk could too.  But, because it did not have to pay a

14    royalty to itself, SanDisk could keep these supra-competitive profits.  Put simply, when a customer—

15    including the named plaintiffs and proposed class members—bought a flash product from SanDisk,

16    the customer paid a higher price than it should have due to the anticompetitive royalty that SanDisk

17    imposed using its fraudulent patents.  This lawsuit seeks to vindicate that antitrust injury.

18                                 **ARGUMENT**

19         To obtain class certification, plaintiffs must demonstrate only that they satisfy the

20    requirements of Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.  *See Zinser v.*

21    *Accufix Res. Inst., Inc.*, 253 F.3d 1180, (9th Cir. 2001), *amended by* 273 F.3d 1266.  The Rule 23(a)

22    requirements are often referred to in shorthand as "numerosity, commonality, typicality and adequacy

23    of representation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  The class

24    must be ascertainable, meaning that the members of the class must be identifiable "by reference to

25

26    [7] Where SanDisk could not coerce its competitors to license the fraudulent patents, it brought suit on
those patents.  *See*, *e.g.*, *Certain NOR and NAND Flash Memory Devices and Products Containing*

27    *Same*, USITC Inv. No. 337-TA-560 (2006).

28    **Motion To Certify Class and for**       7       **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

objective criteria." *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 672 (N.D. Cal. 2011) (citation omitted). Each of these requirements is met here, as demonstrated below. In addition, the common questions of fact "predominate over any questions affecting only individual members" such that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1179 (N.D. Cal. 2013). This case is a clear candidate for class treatment; SanDisk's enforcement of fraudulent patents in violation of the antitrust laws caused wide-ranging harm that can only be remedied effectively through a class action on the part of purchasers who were unjustly overcharged as a result of SanDisk's conduct.

SanDisk has no compelling argument that class certification is improper. Plaintiffs expect SanDisk to respond to this motion by attacking the merits of plaintiffs' antitrust claims. Notably, however, "Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plan & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). SanDisk may disagree with plaintiffs' assertions of fraudulent patent procurement or monopolization of the market, but those disputes do not undermine the fact that a class action is the appropriate vehicle to resolve those questions for the large class of uniformly affected direct purchaser plaintiffs.

A.   **Plaintiffs Satisfy the Requirements of Rule 23(a).**

*Numerosity and Ascertainability.* Plaintiffs easily satisfy the numerosity requirement. The proposed class includes all U.S. direct purchasers of NAND flash memory (in the form of final flash products) from SanDisk between the fraudulent procurement of the reexamined '338 patent (and the corresponding execution ███████████████████) in July 1997 through the expiration of the '338 patent in December 2009. Documents produced by SanDisk demonstrate that there are 541 such purchasers of final flash products in the relevant time period. Sullivan Attach. E-4. *See*

Motion To Certify Class and for
Appointment of Class Counsel and
Memorandum in Support                              8                              Case No. CV 10-02787-SBA

1  *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is

2  presumed at a level of 40 members").  Moreover, these class members are not only ascertainable,

3  they have already been ascertained; the members of the class (and all of their purchases) are

4  identified in Attachment E-10 to plaintiffs' expert report.  Sullivan Attach. E-10.

5       ***Commonality.***  For purposes of Rule 23(a), plaintiffs need not show that every legal and

6  factual issue is common to all class members; only one significant issue is necessary to satisfy the

7  commonality prong.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).  Here,

8  several significant issues are common across the class.

9       The existence of *Walker Process* fraud—whether SanDisk acted fraudulently in procuring the

10  '338 and '517 patents from the PTO—depends on two showings:  (1) a material misrepresentation or

11  omission to the PTO; and (2) "a clear intent to deceive the examiner and thereby cause the PTO to

12  grant an invalid patent."  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed.

13  Cir. 1998).  Both showings will be common to all class members; the relevant acts constituting the

14  fraud occurred between SanDisk and the PTO, not SanDisk and any individual class member.

15       If SanDisk procured its patents through fraud, "antitrust liability under section 2 of the

16  Sherman Act may arise when . . . the patentee has market power in the relevant market[] and has used

17  its fraudulently obtained patent to restrain competition."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d

18  1340, 1367 (Fed. Cir. 1998).  As discussed in plaintiffs' expert report, SanDisk's enforcement of its

19  patents to increase its competitors' costs, earn significant licensing revenue, and raise prices across

20  the marketplace for final flash products provides direct evidence of its power in that market.  Sullivan

21  ¶¶ 39-46; *see also High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)

22  ("Monopoly power is the 'power to control prices or exclude competition' in the relevant market and

23  exists whenever prices can be raised above the competitive market levels.") (citation omitted); *Image*

24  *Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 621 (9th Cir. 1990) ("Monopoly power is the

25  'power to control prices or exclude competition' in the relevant market.").  More importantly for

26  class certification, the existence and use of this market power is common to all class members.  The

27

28  **Motion To Certify Class and for**          9          **Case No. CV 10-02787-SBA**
    **Appointment of Class Counsel and**
    **Memorandum in Support**

1    direct evidence of SanDisk's market power "relates to SanDisk's enforcement and licensing of its

2    patent with other suppliers, not SanDisk's purchasers.  Thus, the evaluation of direct evidence does

3    not vary from one purchaser to another, but is the same singular inquiry across all members of the

4    class."  Sullivan ¶ 40.  Likewise, the evidence of SanDisk's market concentration—which provides

5    additional support for the existence of market power—is common to all members of the proposed

6    class.  *Id.* ¶¶ 55-59.

7            Finally, the damages resulting from SanDisk's antitrust violation is a question common to all

8    class members.  Plaintiffs' expert, Dr. Sullivan, analyzed every single sale of final flash products in

9    the United States that SanDisk made between SanDisk's initial enforcements of the fraudulent patents

10   and the patents' expiration.  Sullivan Attach. E-1.  Dr. Sullivan also analyzed sales outside the

11   relevant time frame to control for the effect that other patents in SanDisk's portfolio might have on

12   licensees' royalty rates.  Specifically, ████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████.  Sullivan ¶ 82.  Dr. Sullivan determined the

15   actual amount of royalties that licensees paid to SanDisk as compared to the royalties that licensees

16   would have paid but-for the fraudulent patents.  *Id.* ¶¶ 81-84.  Using standard regression analysis to

17   control for other factors that affect the price of chips, Dr. Sullivan determined the amount—given

18   customers' demand for final flash products—that SanDisk raised its own prices.  Sullivan ¶¶ 95-101,

19   Attach. G-1 to G3.  These questions are common to all SanDisk's customers and thus all members of

20   the class.  Put simply, SanDisk's overcharge can be calculated for every member of the class using

21   this analysis.  Sullivan Attach. F-15.  And the damages are ascertainable in this manner.  SanDisk

22   ██████████████████████████████████████████████████.  Sullivan ¶ 101.

23   Taking into account a calculation of interest, SanDisk was able to overcharge the class members at

24   least roughly ████████████████████████████████████████████████████████

25   *Id.* ¶ 103.

26

27

28   **Motion To Certify Class and for**                    10                                    **Case No. CV 10-02787-SBA**
**Appointment of Class Counsel and**
**Memorandum in Support**

***Typicality.***  Rule 23(a)(3)'s typicality requirement "is a permissive standard" that "is satisfied 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'"  *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002) (citation omitted); *see also Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005).  That standard is easily satisfied here.  Plaintiffs purchased final flash products (in the case of Ritz, E.S.E., CPM, and MFLASH) from SanDisk in the U.S. during the relevant period; they suffered the same overcharges as every other such purchaser, and the overcharges were caused by the same anticompetitive SanDisk conduct.  *See* Sullivan ¶ 102 (identifying purchases and overcharge payments by each named plaintiff).

As discussed above, all members of the proposed class have identical legal arguments regarding SanDisk's fraudulent and anticompetitive conduct, SanDisk's improper assertion of its patents to raise its competitors' costs, and SanDisk's corresponding ability (and decision) to charge supra-competitive prices for the products it sold to the class members.  *See Teva Pharms. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 225-26 (D. Del. 2008) (finding typicality satisfied when "core pattern of alleged anti-competitive conduct" caused similar injury to all purchaser class members through artificially raised prices).  And plaintiffs' damages model functions the same for all class members. Sullivan ¶¶ 88, 95.  Plaintiffs' claims are not only typical of all class members', they are virtually identical; the claims differ only in the precise amount of each class member's injury, based on the specific products and quantities purchased.  Such differences do not destroy typicality.  *See, e.g., In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1036 (N.D. Miss. 1993) (differences in products or amounts purchased did not destroy typicality when theory of liability and injury were identical).

***Adequacy of Representation.***  To satisfy Rule 23(a)(4), plaintiffs must (1) have no interests that are antagonistic to or in conflict with the interests of the class; and (2) be represented by counsel able to vigorously prosecute the interests of the class.  *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); *In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819, 2008 WL

Motion To Certify Class and for
Appointment of Class Counsel and
Memorandum in Support                                    11                          Case No. CV 10-02787-SBA

1    4447592, at *4 (N.D. Cal. Sept. 29, 2008).  As to the first prong, any alleged conflict of interest

2    "must be actual, not hypothetical."  *SRAM*, 2008 WL 4447592, at *4.  Plaintiffs are aware of no such

3    conflict for either proposed class.  This Court has already rejected SanDisk's argument that plaintiff

4    Giuliano, as a trustee in bankruptcy, is *per se* inadequate as a representative.  Dkt. No. 138 at 5-6.

5    SanDisk has unearthed no reason in discovery why Giuliano cannot fairly represent the interests of

6    the class.  Moreover, as the Court previously noted (*id.* at 6), the presence of additional class

7    representatives in the class (plaintiffs E.S.E. and CPM) weighs against a finding of inadequacy.  *See*

8    *also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d

9    1152, 1162 n.2 (9th Cir. 2001) ("[T]he adequacy-of-representation requirement is satisfied as long as

10   one of the class representatives is an adequate class representative.").

11          As to the second prong, plaintiffs have retained highly skilled counsel with extensive

12   experience in prosecuting antitrust class actions.  Counsel for plaintiffs have pursued this matter

13   vigorously and competently since filing the complaint in 2010, including by obtaining a favorable

14   result on SanDisk's interlocutory appeal to the U.S. Court of Appeals for the Federal Circuit.

15   **B.      This Action Meets the Requirements of Rule 23(b)(3).**

16          ***Predominance.***  This action meets the first requirement of Rule 23(b)(3) because "the

17   questions of law or fact common to class members predominate over any questions affecting only

18   individual members."  Fed. R. Civ. P. 23(b)(3).  "Considering whether questions of law or fact

19   common to class members predominate begins . . . with the elements of the underlying causes of

20   action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  As discussed

21   above, each of the elements of plaintiffs' *Walker Process* cause of action is common across the class

22   members.  *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)

23   ("common questions can predominate if a 'common nucleus of operative facts and issues' underlies

24   the claims brought by the proposed class").

25          *First*, SanDisk's fraudulent procurement and enforcement of its patents through fraud and its

26   enforcement of those patents to extract licensing royalties from its competitors and drive up market

27

28   **Motion To Certify Class and for**                    12                    **Case No. CV 10-02787-SBA**
     **Appointment of Class Counsel and**
     **Memorandum in Support**

prices for final flash products; and its resulting overcharge to its own customers (the proposed class members) are all questions that depend on common proof. *See supra* pp. 4-6. If each class member were required to prove its claim at trial, they would submit the same evidence on each point. *See SRAM*, at *9-10 (common liability issues predominated because common evidence would be necessary to prove claims of all class members).

*Second*, the extent of SanDisk's market power in the relevant market is a question common to the entire class. As plaintiffs' expert explains, there is direct evidence that SanDisk has market power in the relevant market for final flash products. Sullivan ¶¶ 43-46. And it obtained that market power through the same conduct—by enforcing its fraudulently obtained patents against its competitors. Specifically, SanDisk directly drove up the costs of its ████████████ ████████████████████████████—which was passed on cost to customers in the form of higher prices. *Id.* ¶¶ 95-101. Further, plaintiffs' expert provides further evidence SanDisk's market power based on an analysis of market concentration. *Id.* ¶¶ 55-59. All of these issues are common to the class members because each bought NAND flash products from SanDisk—the very products that SanDisk held market power over.

*Third*, each member of the class suffered antitrust injury ("impact") in common due to SanDisk's fraud. Dr. Sullivan accounted for the effect of the patents in suit on SanDisk's licensees' patent royalties. *Id.* ¶¶ 85-87. ████████████████████████████████ ████████████████████████████. Sullivan Attach. C-3. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████. Sullivan ¶¶ 76-77. Along with SanDisk's own admissions concerning the value of the '338 and '517 patents, Dr. Sullivan was able to determine how the market's costs increased due to these fraudulent patents. *Id.* ¶¶ 81-87. Dr. Sullivan then analyzed every sale by SanDisk of all final flash products in the U.S. *Id.* ¶ 92. Using standard regression analysis, he accounted for numerous other factors that could affect prices—customer-specific attributes (such as size and bargaining power of the purchaser), product-

**Motion To Certify Class and for**
**Appointment of Class Counsel and**
**Memorandum in Support**                    13                    **Case No. CV 10-02787-SBA**

1    specific attributes, changes in marketplace conditions over time, and SanDisk's own production costs.

2    *Id.* ¶¶ 95-101, 105-23.  Similar multiple regression analyses have been relied upon by numerous

3    courts in finding that impact and measure of damages are common predominating issues susceptible

4    to common class-wide proof.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 26

5    (D.D.C. 2012); *In re Electronic Books Antitrust Litig.*, No. 11 Md 2293(DLC), 2014 WL 1282293,

6    *14-15 (S.D.N.Y. March 28, 2014).   Using this regression, Dr. Sullivan was able to determine how

7    much SanDisk was able to raise its own prices on all of its final flash products by enforcing the

8    fraudulent patents against its competitors.  Sullivan ¶¶ 101-03. Since each class member purchased

9    final flash products, they were all harmed by the supra-competitive overcharge.

10        *Fourth*, the measure of damages that the class sustained is a common question.  The only

11   difference, in fact, is the specific amount of damages each class member suffered, based on the type

12   and quantity of products purchased.  But such specific calculations do not defeat predominance when,

13   as here, issues of liability are shared.  *See, e.g.*, *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798

14   (7th Cir. 2013) (holding class certification appropriate even though amount of damages might vary

15   across class members because the basic question of liability was common to the class); *Levya v.*

16   *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).  Plaintiffs need only "be able to show that

17   their damages stemmed from the defendant's actions that created the legal liability."  *Levya*, 716 F.3d

18   at 514.  Plaintiffs have met that standard here.

19        The damages model discussed in plaintiffs' expert report applies a common methodology to

20   determine the amount of damages for the individual named plaintiffs and class members and controls

21   for customer-specific variables (such as entity type and purchasing power), meaning that no

22   individual inquiry apart from the model is required to determine the amount of damages for each

23   purchaser.  Sullivan ¶¶ 77-79.  And this damages model is directly tied to plaintiffs' theory of

24   liability:  the model assesses the impact of SanDisk's enforcement of the fraudulently procured

25   patents on SanDisk's flash memory prices.  *See id.* ¶¶ 82-84.  Thus the model shows, for every single

26   purchaser, how exactly SanDisk's *Walker Process* antitrust violation resulted in those purchasers

27

28   **Motion To Certify Class and for**          14              **Case No. CV 10-02787-SBA**
     **Appointment of Class Counsel and**
     **Memorandum in Support**

1    overpaying for final flash products from SanDisk—and plaintiffs' expert can precisely quantify that

2    damage for each individual member of the class.  Sullivan Attach. E-13.

3           *Superiority.*  Courts routinely hold that "[i]n antitrust cases such as this, the damages of

4    individual direct purchasers are likely to be too small to justify litigation, but a class action would

5    offer those with small claims the opportunity for meaningful redress."  *SRAM*, 2008 WL 4447592,

6    at *7.  The same is true here.  Each of the hundreds of direct purchasers would be unlikely to pursue

7    their claims against SanDisk individually; as the data reflects, many of these purchasers suffered total

8    overcharges in the hundreds or thousands of dollars, which would not justify the costs of litigation.

9    *See* Sullivan Attach. E-12.  But the combined effect on all of these purchasers is substantial, making

10   class litigation the superior approach.  *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276

11   F.R.D. 364, 375 (C.D. Cal. 2011) ("certification in this case would be far superior to, and more

12   manageable than, any other procedure available for the treatment of the factual and legal issues raised

13   by Plaintiffs' claims").

14          Moreover, the four factors outlined in Rule 23(b)(3) favor a class action here.  Because every

15   significant legal and factual issue is common to all class members, no individual class member can

16   claim any particular interest in controlling the litigation.[8]  No other litigation concerning this

17   controversy has been commenced.  And SanDisk cannot point to any factor making concentration of

18   the litigation in this forum undesirable or suggesting any likely difficulty in managing the action.

### CONCLUSION

20          Plaintiffs respectfully request that the Court issue an order certifying the proposed class,

21   appointing the named plaintiff as class representatives, appointing MDST as class liaison counsel,

22   and appointing the KHHTEF, Berry Law, and SSH as class co-lead counsel.

---

24   [8] The Court appointed MDST interim liaison counsel and appointed KHHTEF and Berry Law interim
     co-lead counsel.  The Court should designate them liaison counsel and co-lead counsel respectively.
25   The class wishes to add SSH as co-lead counsel.  As outlined in attached declarations, all the firms
     have extensive experience in antitrust and class actions, and all have prosecuted this action in a
26   thorough and expeditious manner.  Exs. H-K.  Further all the firms have expended substantial
     resources in conducting discovery and in protecting the rights of the class.  *See id.*
27

28   **Motion To Certify Class and for**                    15                    **Case No. CV 10-02787-SBA**
     **Appointment of Class Counsel and**
     **Memorandum in Support**

1   Dated: September 2, 2014                    Respectfully submitted,

2                                                /s/ R. Stephen Berry
                                                R. Stephen Berry (D.C. Bar No. 234815)
3   Steven F. Benz (D.C. Bar No. 428026)        BERRY LAW PLLC
    Joseph S. Hall (D.C. Bar No. 475057)        1717 Pennsylvania Avenue, N.W.
4   Alexander S. Edelson (D.C. Bar No. 1006041) Suite 450
    KELLOGG, HUBER, HANSEN, TODD,               Washington, D.C. 20006
5     EVANS & FIGEL, P.L.L.C.                    Telephone:  (202) 296-3020
    1615 M Street, N.W., Suite 400              Facsimile:  (202) 296-3038
6   Washington, D.C. 20036                      sberry@berrylawpllc.com
    Telephone:  (202) 326-7900
7   Facsimile:  (202) 326-7999
    sbenz@khhte.com                             Colleen Duffy-Smith
8   jhall@khhte.com                             MORGAN DUFFY-SMITH &
    aedelson@khhte.com                            TIDALGO LLP
9                                               Colleen Duffy-Smith (CA Bar No. 161163)
    Norman E. Siegel                            1960 The Alameda, Suite 220
10  STUEVE SIEGEL HANSON LLP                    San Jose, CA 95126
    460 Nichols Road, Suite 200                 Telephone:  (408) 244-4570
11  Kansas City, Missouri 64112                 cduffysmith@mdstlaw.com
    Telephone: 816-714-7100
12  Facsimile: 816-714-7101

13  Jason S. Hartley (CA Bar # 192514)
    Ryan O'Dell (CA Bar #290802)
14  STUEVE SIEGEL HANSON LLP
    550 West C Street, Suite 1750
15  San Diego, California 92101
    Telephone:  619-400-5822
16  Facsimile:   619-400-5832

17                              *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28  **Motion To Certify Class and for**              16                    **Case No. CV 10-02787-SBA**
    **Appointment of Class Counsel and**
    **Memorandum in Support**

**CERTIFICATE OF SERVICE**

I, Geoff Bentzel, hereby certify that, on September 2, 2014, the foregoing was served via the Court's electronic notification upon counsel for SanDisk.


/s/ Geoff Bentzel

**Motion To Certify Class and for**
**Appointment of Class Counsel and**
**Memorandum in Support**

**Case No. CV 10-02787-SBA**