1  RAOUL D. KENNEDY (Bar No. 40892)
   DAVID W. HANSEN (Bar No. 196958)
2  JAMES P. SCHAEFER (Bar No. 250417)
   IAN CHEN (Bar No. 287778)
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue
4  Palo Alto, California  94301-1908
   Telephone:  (650) 470-4500
5  Raoul.Kennedy@skadden.com
   David.Hansen@skadden.com
6  James.Schaefer@skadden.com
   Ian.Chen@skadden.com
7
   MICHAEL H. MENITOVE (admitted *pro hac vice*)
8  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square
9  New York, New York  10036
   Telephone:  (212) 735-3000
10 Michael.Menitove@skadden.com

11 Attorneys for Defendant,
   SANDISK CORPORATION
12

13              UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16

17 ALFRED T. GIULIANO, Chapter 7 & Trustee          CASE NO.  CV 10-02787-SBA
   of the Ritz Estate, on Behalf of the Ritz Estate;
18 CPM Electronics Inc.; E.S.E. Electronics, Inc.;   **SANDISK CORPORATION'S NOTICE**
   and MFLASH, Inc.,                                 **OF MOTION, MOTION FOR**
19                                                    **SUMMARY JUDGMENT, AND**
   On Behalf of Themselves and All Others            **MEMORANDUM OF POINTS AND**
20 Similarly Situated,                               **AUTHORITIES**

21          Plaintiffs,                              Hearing Date:       March 10, 2015
                                                     Time:               1:00 p.m.
22      v.                                           Courtroom:          1, Oakland
                                                     Judge:  Hon. Saundra B. Armstrong
23 SANDISK CORPORATION,

24          Defendant.

25

26

27        REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

28

SANDISK'S MOTION FOR SUMMARY JUDGMENT          CASE NO.  CV 10-02787-SBA

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** at 1:00 p.m. on March 10, 2015, or as soon thereafter as the matter may be heard, Defendant SanDisk Corporation ("SanDisk") will, and hereby does, move both for summary judgment on all claims set forth in the operative Fourth Amendment Complaint ("4AC") of Plaintiffs Alfred T. Giuliano, Chapter 7 Trustee of the Ritz Estate ("Ritz"), CPM Electronics, Inc. ("CPM"), E.S.E. Electronics, Inc. ("ESE"), and MFLASH, Inc. ("MFLASH") (together, "Plaintiffs") and summary adjudication that there is no genuine issue of material fact that:

1. Plaintiffs cannot prove (a) antitrust injury, (b) causation, or (c) damages as to their *Walker Process* fraud," "tortious conversion," "customer threats," "anticompetitive settlement," and "refusal to deal" theories.

2. SanDisk did not obtain U.S. Patent Nos. (a) 5,172,338 (the "'338 patent") or (b) 5,991,517 (the "'517 patent") (together, the "Disputed Patents") by fraud on the United States Patent and Trademark Office ("PTO").

4. SanDisk did not misrepresent a material fact to the PTO.

3. SanDisk did not withhold material references from the PTO that invalidate the Disputed Patents.

5. SanDisk did not have specific intent to deceive the PTO.

6. SanDisk does not possess (a) market power or (b) a dangerous probability of obtaining market power in any relevant antitrust market.

7. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, and the accompanying Declaration of Ian Chen, the reply papers to be filed by SanDisk, the pleading and other papers on file herein, including the 4AC, and such other evidence and argument as may be presented to the Court.

SanDisk certifies that it has complied with the Court's meet and confer requirements and that counsel for Plaintiffs have indicated that they will oppose this motion.

DATED: February 3, 2015          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____/s/ James P. Schaefer_____
                    JAMES P. SCHAEFER

Attorneys for Defendant,
SANDISK CORPORATION

i

1

**TABLE OF CONTENTS**

2

PAGE

3   I.      INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................1

4   II.     BACKGROUND ................................................................................................................2

5           A.      Pertinent Procedural History...............................................................................2

6           B.      The Disputed Patents ..........................................................................................3

7           C.      SanDisk's Patent Action Against Samsung...........................................................3

8           D.      The '338 Patent Reexamination ...........................................................................5

9           E.      The SanDisk/ST Patent Actions...........................................................................6

10  III.    LEGAL ANALYSIS AND ARGUMENT ..........................................................................8

11          A.      The Summary Judgment And *Walker Process* Fraud Standards ............................8

12          B.      SanDisk Did Not Commit Fraud During The '338 Patent Reexamination ...........10

13          C.      SanDisk Did Not Withhold Material References From The PTO .........................11

14          D.      Plaintiffs Cannot Establish The Other Elements Of Their Antitrust Claims.........14

15                  1.      Plaintiffs Lack Both Article III And Antitrust Standing............................14

16                  2.      Plaintiffs Cannot Prove Causal Antirust Injury And Damages .................16

17                  3.      Plaintiffs Cannot Prove SanDisk Had Market Power In Any Market .......19

18                          (a)     Plaintiffs Cannot Prove Market Power With Indirect
19                                  Evidence.......................................................................................20

20                                  (i)     Plaintiffs Failed To Define Any Relevant Market.............20

21                                  (ii)    SanDisk's Alleged Market Shares Are Too Low ..............21

22                                  (iii)   Plaintiffs Cannot Prove Barriers To Entry Or
                                            Expansion..................................................................22

23                          (b)     Plaintiffs Cannot Prove Market Power Through Direct
24                                  Evidence.......................................................................................23

25                                  (i)     Plaintiffs Cannot Prove Restricted Output And
                                            Supracompetitive Pricing In Any Market ....................24

26                                  (ii)    Plaintiffs Failed To Define A Relevant Market................25

27  CONCLUSION..............................................................................................................................25

28

# TABLE OF AUTHORITIES

PAGES

**Federal Cases**

*Alexsam, Inc. v. IDT Corp.,*
715 F.3d 1336 (Fed. Cir. 2013)...........................................................12, 13

*Allergan, Inc. v. Barr Labs., Inc.,*
501 F. App'x 965 (Fed. Cir. 2013) (unpublished)...............................12, 13

*American Ad Management, Inc. v. GTE Corp.,*
190 F.3d 1051 (9th Cir. 1999)............................................................15, 16

*Bhan v. NME Hospitals, Inc.,*
772 F.2d 1467 (9th Cir. 1985)................................................................15

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
157 F.3d 1340 (Fed. Cir. 1998)................................................................9

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.,*
2011 WL 4528303 (E.D. Pa. Sept. 30, 2011)......................................24, 25

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).................................................................................8

*Centricut, LLC v. Esab Grp., Inc.,*
390 F.3d 1361 (Fed. Cir. 2004)................................................................12

*Church & Dwight Co. v. Mayer Labs., Inc.,*
868 F. Supp. 2d 876 (N.D. Cal. 2012).......................................................24

*City of Vernon v. S. Cal. Edison Co.,*
955 F.2d 1361 (9th Cir. 1992)...........................................................16, 18

*Colsa Corp. v. Martin Marietta Servs., Inc.,*
133 F.3d 853 (11th Cir. 1998)..................................................................21

*Delano Farms Co. v. Cal. Table Grape Comm'n,*
655 F.3d 1337 (Fed. Cir. 2011)................................................................25

*Dippin' Dots Inc. v. Mosey,*
476 F.3d 1337 (Fed. Cir. 2007).................................................................9

*E. Portland Imaging Ctr., P.C. v. Providence Health System-Oregon,*
280 F. App'x 584 (9th Cir. 2008) (unpublished).........................................22

*Florida Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996)...................................................................17

*Forsyth v. Humana, Inc.,*
114 F.3d 1467 (9th Cir. 1997), aff'd 525 U.S. 299 (1999).................15, 19, 23

iii

*Gerlinger v. Amazon.com, Inc.*,
   526 F.3d 1253 (9th Cir. 2008) ........................................................................ 15

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2009 WL 112834 (N.D. Cal. Jan. 16, 2009) ...................................................... 13

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ........................................................................ 21

*Immersion Corp. v. Sony Computer Entertainment America, Inc.*,
   2005 WL 680026 (N.D. Cal. 2005) .................................................................. 13

*In re Berg*,
   320 F.3d 1310 (Fed. Cir. 2003).......................................................................... 10

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .............................................................. 21

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008)........................................................................ 11

*Kaiser Found. v. Abbott Labs.*,
   2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) .................................................... 25

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)........................................................................................ 14

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*,
   588 F.3d 908 (6th Cir. 2009) .......................................................................... 21

*L.A. Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993) ............................................................................ 22

*MCI Communications Corp. v. AT&T*,
   708 F.2d 1081 (7th Cir 1982) .......................................................................... 18

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991) ........................................................................ 20

*Nobelpharma AB v. Implant Innovations Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998)........................................................................ 9

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)........................................................................................ 16

*Perfect Web Techs., Inc. v. Info USA, Inc.*,
   587 F.3d 1324 (Fed. Cir. 2009)........................................................................ 12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc).......................................................... 13

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   536 F.3d 1256 (Fed. Cir. 2008)........................................................................ 13

iv

*Q-Pharma, Inc. v. Andrew Jensens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004)......................................................................................9

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...................................................................................passim

*SanDisk Corp. v. Kingston Technology Co.*,
  863 F. Supp. 2d 815 (W.D. Wis. 2012) ........................................................................23

*Schumer v. Lab. Computer Sys.*,
  308 F.3d 1304 (Fed. Cir. 2002)....................................................................................13

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
  927 F.2d 1565 (Fed. Cir. 1991)....................................................................................14

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993)......................................................................................................20

*Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*,
  537 F.3d 1357 (Fed. Cir. 2008).............................................................................9, 11, 14

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
  2007 WL 2318903 (N.D. Cal. Aug. 13, 2007),
  *aff'd per curiam* 301 F. App'x 959 (Fed. Cir. 2008) (unpublished)............................8, 10

*Therasense, Inc. v. Becton, Dickinson and Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) (en banc)....................................................................9, 14

*Townshend v. Rockwell Int'l Corp.*,
  55 U.S.P.Q.2d 1011 (N.D. Cal. 2000) ..........................................................................22

*Twin Cities Bakery Workers Health And Wellness Fund v. Biovail, Corp.*,
  2005 WL 3675999 (D.D.C. 2005) .................................................................................17

*Universal Grading Serv. v. eBay, Inc.*,
  563 F. App'x 571 (9th Cir. 2014) (unpublished)..........................................................16

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd* 257 F.3d 256 (2d Cir. 2001) ..............18, 19

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
  382 U.S. 172 (1965)........................................................................................1, 14, 20, 25

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010)...............................................................................12, 13

**Statutes**

15 United States Code § 15.................................................................................................16

15 United States Code § 26.................................................................................................16

35 United States Code § 112(6)............................................................................................4

37 Code of Federal Regulations § 1.104(a) ......................................................................10

v

37 Code of Federal Regulations§ 1.56(b) ....................................................................................... 11

**Rules**

Federal Rules of Civil Procedure 56(c) ........................................................................................ 8

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION AND SUMMARY OF ARGUMENT

To prevail on their *Walker Process* fraud antitrust claim, Plaintiffs must prove: (1) SanDisk knowingly enforced an invalid patent procured by fraud on the PTO, and (2) all of the other elements of a monopolization or attempted monopolization claim under Section 2 of the Sherman Act. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965). After more than four years of litigation, multiple amendments to the complaint, and extensive discovery, Plaintiffs cannot prove either of these elements.

***First***, Plaintiffs cannot prove SanDisk obtained the Disputed Patents by fraud on the PTO.

Plaintiffs allege that SanDisk lied to the PTO during reexamination of the '338 patent by claiming that latch 721 in Figure 16 of the patent is a "one-way" latch, and SanDisk furthered its lie by withholding a paper in which the '338 patent's inventors drew a "two-way" latch the exact same way they drew latch 721. (4AC ¶¶ 48, 70-72.) There is no genuine dispute, however, that SanDisk informed the PTO of the undisputed fact that a latch drawn like latch 721 can function as either a one- or two-way latch depending on its implementation and that two-way latches are more common than one-way latches. SanDisk and Samsung made voluminous submissions regarding their competing positions as to whether latch 721 functioned as a one- or two-way latch. Notwithstanding Samsung's arguments that latch 721 is a two-way latch and SanDisk's admission that a two-way latch is drawn the exact same way as latch 721, the PTO examiner—a person of ordinary skill in the art—determined that latch 721 is a "one-way" latch based on the '338 patent disclosure. Plaintiffs have no admissible evidence to the contrary. Accordingly, Plaintiffs cannot prove either falsity or specific intent to deceive the PTO.

Plaintiffs also allege that SanDisk withheld known references from the PTO that supposedly invalidate the pertinent claims of the Disputed Patents. (4AC ¶¶ 53-69, 73-75.) The Disputed Patents disclose and claim highly technical inventions relating to non-volatile semiconductor memory. Plaintiffs chose not to engage a technical expert and they have no admissible evidence to prove that the references invalidate any claims of the Disputed Patents. Plaintiffs also have no independent evidence that SanDisk intended to deceive the PTO by

1

1  withholding the references, much less the "clear and convincing" evidence required to prove a

2  *Walker Process* claim.

3      ***Second***, Plaintiffs cannot establish the other elements of their antitrust claims.  Plaintiffs

4  rely on Dr. Ryan Sullivan to establish antitrust injury, causation, damages, and market power.  As

5  previously demonstrated in SanDisk's opposition to Plaintiffs' pending motion for class

6  certification (Dkt. 256), and SanDisk's pending motion to exclude Dr. Sullivan's class certification

7  opinions (Dkts. 259, 267), Dr. Sullivan's methodology and opinions are inadmissible.  Because Dr.

8  Sullivan's subsequent merits report does not cure the fatal flaws in his proposed testimony,

9  SanDisk is concurrently moving to exclude Dr. Sullivan's merits testimony.  Furthermore, even if

10  Dr. Sullivan's opinions were admissible, expert testimony like Dr. Sullivan's that is rooted in

11  hypothetical assumptions cannot substitute for actual market data, and expert testimony like his

12  that is lacking a factual foundation cannot defeat a motion for summary judgment.

13  **II.    BACKGROUND**

14       **A.    Pertinent Procedural History**

15       Plaintiffs' original through third amended complaints alleged that SanDisk monopolized a

16  single antitrust market encompassing both NAND flash memory chips ("flash **chips**") and NAND

17  flash memory products ("flash **products**") and that Plaintiffs were direct purchasers in that market.

18  (Dkt. 1, 27, 143, 150.)  On September 24, 2014,  Plaintiffs filed the operative 4AC, which alleges

19  that SanDisk monopolized or attempted to monopolize both a flash **chip** market and six separate

20  **product** markets: SSD, memory cards, wireless memory, USB, embedded storage, and music and

21  video players.  (4AC ¶ 29.)

22       The 4AC alleges several theories of anticompetitive conduct, *i.e.*, *Walker Process* fraud,

23  tortious conversion, customer threats, anticompetitive settlement, and refusal to deal.

24  Dr. Sullivan's injury, causation, and damages opinions are, however, 

25  ▮▮▮▮▮▮▮▮  (*See* Declaration of Ian Chen in Support of SanDisk's Motion for Summary

26  Judgment ("Chen Decl.") Ex. 26 ("Sullivan Rep.") ¶12; Ex. 27 ¶14 ("Sullivan 2d Rep.").)  SanDisk

27  is, therefore, entitled to summary judgment on Plaintiffs' other theories.  Plaintiffs' inability to

28  prove *Walker Process* fraud also disposes of Plaintiffs' other theories because "each of [Plaintiffs']

2

1 claims is dependent upon the theory that [SanDisk has] engaged in the enforcement of fraudulently

2 obtained patents." (Dkt. 60 at 4.)

3        Fact and expert discovery is closed. (Dkt. 227.) Plaintiffs did not disclose a technical

4 expert. (Chen Decl. ¶ 28.) Plaintiffs' sole expert is Dr. Sullivan. (*Id.*)

5        **B.      The Disputed Patents**

6        The '338 patent, titled "Multi-state EEprom Read and Write Circuits and Techniques," is

7 directed generally to improvements in EEprom (electrically erasable and programmable read only

8 memory) technology. (Chen Decl. Ex. 1 ("'338 patent").) An EEprom is a type of non-volatile

9 semiconductor memory that stores information in an array of memory cells (the basic unit of

10 memory). (*Id.* at 1:13-68.) EEproms suffer fatigue due to programming and erasing. (*Id.* at 15:37-

11 46.) The '338 patent addressed the fatigue issue at the chip level through individually erasing only

12 selected sectors of the chip array and through inhibiting further programming of verified cells.[1]

13 (*See, e.g., id.* at 18:62-68, 20:10-16.) The named inventors are SanDisk founders Dr. Eli Harari

14 and Sanjay Mehrotra. (*See generally id.*) The '338 patent expired in December 2009. (*Id.*)

15        The '517 patent, titled "Flash EEprom System With Cell By Cell Programming

16 Verification," is directed generally to improvements in "flash" EEprom technology. (Chen Decl.

17 Ex. 2.) "Flash" refers to the bulk erasing operation, where entire sectors are erased together. (*Id.* at

18 1:66-2:2.) The '517 patent also addressed the fatigue issue at the chip level. (*Id.* at 2:10-14, 2:44-

19 50, 2:61-67.) Dr. Harari and Mr. Mehrotra are named inventors on the '517 patent. (*See generally*

20 *id.*) The '517 patent expired in April 2009. (*Id.*)

21        **C.      SanDisk's Patent Action Against Samsung**

22        SanDisk filed an action for patent infringement against Samsung with the U.S. International

23 Trade Commission ("ITC") on January 11, 1996. SanDisk ultimately asserted that Samsung

24 infringed claims 1, 2 and 4 of U.S. patent No. 5,418,752 (the "'752 patent") and claim 27 of the

25 '338 patent. (4AC ¶ 45; *see also* Chen Decl. Ex. 7 ("-382 ID") at 1.)

26        Claim 27 of the '338 patent claims an improvement in programming a "chunk" of data into

27 ───────────────────

[1] Fatigue can also be addressed at the system level *via* the controller through techniques such as

28 wear leveling and error correction codes.

3

1   addressed cells in an array of EEprom memory cells, "wherein the improvement comprises:"

2       "means for inhibiting further programming of correctly verified cells among the
3       plurality of addressed cells; and

4       "means for further programming and verifying in parallel the plurality of addressed
5       cells and inhibiting programming of correctly verified cells until all the plurality of
        addressed cells are verified correctly."

6   ('338 patent at 26:48-54.)  By inhibiting further programming of correctly verified cells until the

7   remainder of the addressed cells are verified to be programmed correctly, the invention of claim 27

8   reduces cell fatigue.  (-382 ID at 149.)

9       A dispute arose between the parties concerning the proper interpretation of the program

10  inhibit claim element.  Both parties agreed that the inhibit "means" was latch 721 in Figure 16 of

11  the '388 patent, illustrated as cross-coupled inverters:

12  

13

14  ('338 patent at Fig. 16.)[2]  SanDisk argued that claim 27 should be interpreted to mean that verified

15  cells were "permanently inhibited" pending programming of the remaining cells and that latch 721

16  was a "one-way" latch that performs the permanent inhibit function.  (Chen Decl. Ex. 8 at 25-26.)

17  Samsung argued that the claim covered "temporary inhibit" and that latch 721 was a "two-way"

18  latch.  (Chen Decl. Ex. 9 at 7-14.)

19      The parties presented extensive expert submissions, testimony, proposed fact findings, and

20  argument on this issue to the ITC Administrative Law Judge ("ALJ").  (-382 ID at 2.)  This

21  included admissions by SanDisk's Mr. Mehrotra that one- and two-way latches are often drawn the

22  same way and "a two-way latch is drawn the exact same way as latch 721 in Fig. 16."  (*Id.* at 66.)

23      The ALJ's February 26, 1997 -382 ID exhaustively reviewed the parties' submissions and

24  "found as a matter of law that claim 27 requires permanent inhibition of further programming

25  pulses to a cell that has been verified during the programming of a chunk of data."  (*Id.* at 93.)  He

26  _____

27  [2]  Under 35 U.S.C. § 112(6), "[a]n element in a claim for a combination may be expressed as a
    means . . . for performing a specified function . . . and such claim shall be construed to cover the
28  corresponding structure . . . described in the specification and equivalents thereof."

1  also held that "latch 721 in Figure 16 is a 'one-way latch,'" (*id.* at 66) and that "the inhibit means

2  should be interpreted to include a one-way latch 721 or its equivalent" (*id.* at 70).  In fact, the ALJ

3  held that "[t]he preferred embodiment of the '338 patent is a multistate device" and that "*[i]f latch*

4  *721 were not a one-way latch, there would be catastrophic failure of the multistate device.*"  (*Id.*

5  at 68 & 173 (emphasis added).)  The ALJ acknowledged Mr. Mehrotra's testimony in his decision:

6        Latches are often referred to as "one-way" or "two-way."  One-way and two-way
         latches are often drawn in the same manner.  Mehrotra, Tr. 372, 397.
7

8  (*Id.* at 66, 172.)

9        The ALJ rejected Samsung's invalidity arguments concerning the Torelli article, the M293

10 device, and the related technical product brochures because they did not "disclose the function of

11 permanently inhibiting the programming of verified cells" and this concept "was not obvious to an

12 individual of ordinary skill in 1989." (*Id.* at 97; *see also id.* at 94, 101.)

13       Samsung appealed the ID.  On April 15, 1997, the ITC, "[h]aving examined the record in

14 [the] investigation, including the ID," determined only to review two issues concerning whether the

15 ALJ erred in finding infringement of certain Samsung devices under the '752 patent.  (Chen Decl.

16 Ex. 37 at 2.)

17       SanDisk and Samsung settled their differences and entered into a patent portfolio cross

18 license agreement on June 27, 1997, before any Commission final determination.  (*See* Chen Decl.

19 Ex. 32.)  The ITC's findings were not appealed to the Federal Circuit.

20     **D.**    **The '338 Patent Reexamination**

21       While the ITC action was pending, SanDisk and Samsung both requested reexamination of

22 the '338 patent based on the Torelli article and the M293 product and related technical product

23 brochures.  (Chen Decl. Exs. 3-4.)  The PTO granted the request on November 18, 1996.  (Chen

24 Decl. Ex. 5.)

25       The reexamination centered on Samsung's and SanDisk's positions concerning the

26 "permanent" versus "temporary" inhibit issue and the related one- versus two-way latch issue.

27 (Chen Decl. Ex. 6 at 7-8; Ex. 12 at 3-12.)  The parties provided the PTO with all of the pertinent

28 materials from the ITC action, including briefs, expert reports, testimony, proposed fact findings,

1   the -382 ID and the Commission's April 15, 1997 review order.  (Chen Decl. ¶8 & Ex. 6 at 5-6.)
2   The Examiner was thus informed that a "two-way latch is the normal latch encountered by those in
3   the art" and that Mr. Mehrotra admitted that one- and two-way latches are often drawn in the same
4   manner and "a two-way latch is drawn the exact same way as latch 721 in Fig. 16."  (Chen Decl.
5   Ex. 10 at 60-61.)

6         Samsung submitted a lengthy Reexamination Reply on March 17, 1997 that contained a
7   detailed argument that the ALJ's decision on the permanent inhibit/one-way latch issue was wrong
8   and noted that "the findings of the ALJ are not binding on the PTO."  (Chen Decl. Ex. 12 at 2 n.2.)
9   Samsung argued that "none of the terms now advanced by SanDisk in support of its interpretation
10  [of claim 27]—"program terminate," permanently inhibit, or "one-way latch"—appear anywhere in
11  the specification or claims of the '338 patent."  (*Id.* at 5.)  Samsung argued that SanDisk's
12  interpretation was "inconsistent with the express language (and figures) disclosed" in the '338
13  patent.  (*Id.* at 9.)  Samsung argued that because claim 27 was not limited to "permanently latched
14  inhibit," the claim was invalid based on the submitted prior art.  (*Id.* at 12-15.)

15        On April 16, 1997, the Examiner confirmed the patentability of claim 27 and the other
16  challenged claims.  In his "Reason For Patentability/Confirmation," the Examiner held that "the
17  inhibiting feature recited in the claims of the '338 patent is enabled by latch 721 in Figure 16 which
18  is a one-way resettable latch."  (Chen Decl. Ex. 14 at 3.)  He also held that the Torelli article and
19  the "product brochures and technical notes (including M293)" did not disclose "means for
20  inhibiting programming of correctly verified cells until all the plurality of cells are verified
21  correctly."  (*Id.* at 2.)

22        **E.    The SanDisk/ST Patent Actions**

23        In 2005, STMicroelectronics, Inc. ("ST") sued SanDisk for patent infringement in the
24  Eastern District of Texas.  (Chen Decl. Ex. 33.)  ST also sued SanDisk in California state court,
25  claiming to own a number of SanDisk patents that Dr. Harari was supposedly required to assign to
26  a prior company he founded that ST had acquired.  (Chen Decl. Ex. 36.)  SanDisk filed two ITC
27  investigations, 337-TA-526 (the "-526 Investigation") and 337-TA-560 (the "-560 Investigation")
28  and an infringement action in this District alleging that ST infringed the Disputed Patents.  (Chen

1 | Decl. Exs. 34, 38-39.)  ST filed a *Walker Process* counterclaim against SanDisk, which Plaintiffs
2 | have copied in this case.  (Chen Decl. Ex. 35.)

3 |      Echoing Samsung, ST argued in the -526 Investigation that claim 27 of the '338 patent was
4 | properly interpreted to cover temporary inhibit and that latch 721 was a two-way latch.  The parties
5 | presented extensive expert submissions, testimony, proposed fact findings and argument on this
6 | issue.  (*See* Chen Decl. Ex. 38 at 3.)  The ALJ again held for SanDisk, finding that "a person of
7 | ordinary skill in the art at the time the '338 patent was filed would conclude that the function of
8 | 'means for inhibiting' to be terminating or inhibiting any further programming of the verified cells
9 | for the remainder of the programming cycle."  (*Id.* at 50.)  He also held that "the structure
10 | associated with the claim element 'means for inhibiting' is the one-way latch 721 in conjunction
11 | with the program circuit with inhibit."  (*Id.* at 51.)

12 |      The ALJ held that the accused ST products did not infringe claim 27.  (*Id.* at 182.)  He held
13 | that the products did not satisfy the inhibit claim limitation because they did not include the same
14 | one-way latch as latch 721, and "with respect to any alleged structural equivalent to one-way latch
15 | 721 in the accused ST products . . . [the circuitry in the ST products] would not perform the
16 | inhibiting function in substantially the same way as the disclosed latch 721 of the '338 patent[.]"
17 | (*Id.* at 102.)

18 |      The ALJ rejected ST's arguments that (i) the "Simko patent" anticipated claim 27, and
19 | (ii) claim 27 was obvious based on the "JP100" Japanese Laid-Open Patent.  (*Id.* at 109-25.)

20 |      The ALJ also rejected ST's argument that SanDisk had defrauded the PTO during the '338
21 | patent's reexamination by not providing the PTO with a 1992 VLSI paper authored by Mr.
22 | Mehrotra and Dr. Harari (the "VLSI paper") which included a latch drawn the same as latch 721.
23 | (*Id.* at 128-36.)  The paper was two pages long and did not include the terms "one-way," "two-way"
24 | or "latch."  Mr. Mehrotra testified in connection with the investigation that the latch functioned as a
25 | two-way latch in the circuit shown in the paper.  (Chen Decl. Ex. 18 at 247:7-248:3.)  Rejecting
26 | ST's fraud argument, the ALJ stated:

27 |      [T[he Examiner had before him in the reexamination proceeding detailed arguments
     advocating for and against the "one-way latch" claim construction.  The [ALJ] finds
28 |      no material facts that SanDisk failed to present to the [PTO] that were false nor does

7

---

SANDISK'S MOTION FOR SUMMARY JUDGMENT            CASE NO.  CV 10-02787-SBA

1    he find that SanDisk withheld material information. Significantly, the record is
2    devoid of any evidence that anyone involved in the reexamination proceeding of the
     '338 patent had any intent to deceive the [PTO].

3    (Chen Decl. Ex. 38 at 136.)

4         The ITC affirmed the ALJ's determination, and neither party appealed to the Federal

5    Circuit. (*Id.*)

6         The ALJ in the -560 Investigation did not address the arguments presented concerning the

7    interpretation or validity of the '338 patent because SanDisk did not satisfy the "domestic industry"

8    requirement for an ITC action. (Chen Decl. Ex. 39 at 45-46.)

9         Concerning the '517 patent, the ALJ noted that it did not include the "inhibiting means"

10   element of claim 27. (*Id.* at 65.) Rather, claim 1 of the '517 patent claimed "terminating [the]

11   application of appropriate voltage conditions to individual ones of said plurality of memory cells

12   upon their being determined to have reached desired threshold level ranges while continuing to

13   apply said appropriate voltage conditions to others of said plurality of cells until all of the plurality

14   of cells are determined to have reached their desired threshold level ranges." (*Id.* at 46.) Based on

15   extensive expert submissions and other evidence submitted by the parties, the ALJ held that the ST

16   product at issue infringed claims of the '517 patent, but also that the asserted claims were invalid

17   over prior art asserted by ST, including the "GB 145" UK patent and the JP100 reference in

18   combination with other references. (*Id.* at 114-43.)

19        Neither party petitioned the ITC for review of the ID and the ITC determined in July 2007

20   not to review the -560 ID. (*Id.* at 1-2.) Neither party filed a Federal Circuit appeal.

21        ST and SanDisk reached a global settlement in September 2009. (Chen Decl. Ex. 40.)

22   **III.    LEGAL ANALYSIS AND ARGUMENT**

23        **A.    The Summary Judgment And *Walker Process* Fraud Standards**

24        Summary judgment in SanDisk's favor "is appropriate if no genuine issue of material fact

25   exists and [SanDisk] is entitled to judgment as a matter of law." *Sumitomo Mitsubishi Silicon*

26   *Corp. v. MEMC Elec. Materials, Inc.*, 2014 WL 2318903, at *4 (N.D. Cal. Aug. 13, 2007) (citing

27   Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *aff'd per curiam* 301

28   F. App'x 959 (Fed. Cir. 2008) (unpublished). SanDisk "bears the initial burden of demonstrating

                                                 8

SANDISK'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. CV 10-02787-SBA

1   the absence of any genuine issue of material fact." *Id.* "An issue is 'genuine' if the evidence is such

2   that a reasonable jury could return a verdict for the non-moving party. An issue is 'material' if its

3   resolution could affect the outcome of the action." *Id.* (citations omitted)

4          Once SanDisk meets its initial burden, the burden shifts to Plaintiffs "to set forth specific

5   facts showing there is a genuine issue for trial." *Id.* at *5. In responding to SanDisk's motion,

6   Plaintiffs "cannot merely rely on the pleadings"; rather, they "must present specific and supported

7   material facts, of sufficient probative value, to preclude summary judgment." *Id.* Plaintiffs must

8   "identify[] with reasonable particularity the evidence that precludes summary judgment." *Id.*

9   Failure to do so allows the Court to "properly grant summary judgment in favor of [SanDisk]." *Id.*

10          *Walker Process* plaintiffs must prove that the patents in dispute were "obtained through

11   actual fraud upon the PTO." *Dippin' Dots Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007).

12   They must submit "independent and clear evidence of deceptive intent together with a clear

13   showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or

14   omission." *Nobelpharma AB v. Implant Innovations Inc.*, 141 F.3d 1059, 1070-71 (Fed. Cir. 1998)

15   (holding the alleged misrepresentation or omission must "cause the PTO to grant an ***invalid***

16   patent"); *Dippin' Dots*, 476 F.3d at 1347 (the high standard of materiality in a *Walker Process* case

17   requires plaintiffs to prove that the disputed patents "'would not have issued but for the patent

18   examiner's justifiable reliance on the patentee's misrepresentation or omission'") (citing *C.R. Bard,*

19   *Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998))).

20          Plaintiffs must prove both (i) "but-for" materiality, and (ii) specific intent to deceive by

21   clear and convincing evidence. *C.R. Bard*, 157 F.3d at 1345-47. "In a case involving

22   nondisclosure of information, clear and convincing evidence must show that the applicant ***made a***

23   ***deliberate decision*** to withhold a ***known*** material reference." *Therasense, Inc. v. Becton,*

24   *Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (emphasis added). Specific

25   intent to deceive must be "the single most reasonable inference able to be drawn from the

26   evidence." *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir.

27   2008). Where "multiple reasonable inferences . . . may be drawn, ***intent to deceive cannot be***

28   ***found.***" *Therasense*, 649 F.3d at 1290-91 (emphasis added).

9

1    **B.    SanDisk Did Not Commit Fraud During The '338 Patent Reexamination**

2    Plaintiffs allege that SanDisk defrauded the PTO during the '338 patent reexamination by

3   falsely arguing that "claim 27 was patentable because the inhibit function was 'permanent' . . . and

4   that a person of ordinary skill in the art would know that latch 721 operates as a 'one-way latch'

5   required for permanent inhibit." (4AC ¶48.) Plaintiffs allege that "[l]atch 721 is a standard, two-

6   way data latch and the inventors of the '338 patent had just published an article—not disclosed to

7   the examiner—that described an identically drawn latch as just that—a standard two-way data

8   latch." (*Id.* ¶50.) The "article" referenced by Plaintiffs is the 1992 VLSI paper authored by Mr.

9   Mehrotra, Dr. Harari, and others.

10    But the information from the VLSI paper that SanDisk supposedly hid from the PTO—that

11   SanDisk believed a latch "identically drawn" to latch 721 could be a two-way latch—was in fact

12   disclosed to the PTO in connection with the '338 patent reexamination. Samsung's expert in the

13   ITC action testified that a "two-way latch is the normal latch encountered by those in the art" and

14   Mr. Mehrotra *admitted* that one- and two-way latches are often drawn in the same manner and "a

15   two-way latch is drawn the exact same way as latch 721 in Fig. 16." All of this information was

16   presented to the Examiner during reexamination and he nonetheless determined, based on the

17   extensive evidence and argument submitted by the parties and the '338 patent disclosure, that latch

18   721 was a one-way latch. Plaintiffs have no admissible evidence to the contrary and are, therefore,

19   unable to prove the requisite "but for" materiality. *See* § III.C, *infra*.

20    As this court acknowledged in *Sumitomo*, PTO examiners are "persons of scientific

21   competence" in the technical field at issue. 2007 WL 2318903, at *11 (quoting *In re Berg*, 320

22   F.3d 1310, 1315 (Fed. Cir. 2003)). The Examiner conducting the '338 reexamination was required

23   to thoroughly study and investigate the issues presented by the reexamination, 37 C.F.R. §

24   1.104(a), and he is presumed to have done so. Because the allegedly significant information

25   included in the VLSI paper (*i.e.*, Mr. Mehrotra's belief that a latch drawn like latch 721 in the '338

26   patent could be a two-way latch) "was in fact disclosed to the PTO," SanDisk's failure to submit the

27   VLSI paper "is insufficient to raise a triable fact as to *Walker Process* fraud." *See Sumitomo*, 2007

28

SANDISK'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. CV 10-02787-SBA

1  WL 2318903, at *11.[3]  To hold otherwise would "simply assume[] the PTO's incompetence, which

2  is inappropriate." *Id.*

3        Also, because all of the pertinent information was "submitted for the patent examiner to

4  examine [himself], [the examiner] was free to accept or reject" SanDisk's arguments on the one-

5  way latch issue. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008).

6  Under these circumstances, SanDisk's arguments cannot constitute a material omission or

7  misrepresentation. *See id.*  Rather they "amounted to mere attorney argument and [Federal Circuit]

8  precedent has made clear that an applicant is free to advocate its interpretation of claims and the

9  teachings of the prior art." *Id.* (citations omitted).

10        Plaintiffs have no evidence that Mr. Mehrotra or SanDisk's patent counsel intended to

11  deceive the PTO, much less the requisite clear and convincing evidence of a deliberate intent to

12  withhold known material references.  Mr. Mehrotra and SanDisk's patent counsel have both denied

13  having such an intent.  (Chen Decl. Ex. 17 at 5-7; Ex. 45 at 9, 11-12, 14-19.)  Under the

14  circumstances, an intent to deceive the PTO is clearly not "the single most reasonable inference

15  able to be drawn from the evidence." *See Star Scientific*, 537 F.3d at 1366.

16        **C.    SanDisk Did Not Withhold Material References From The PTO**

17        Plaintiffs allege that SanDisk defrauded the PTO during reexamination of the '338 patent

18  and prosecution of the '517 patent by not submitting to the PTO the Simko patents and the JP100

19  patent (each of which allegedly "disclose a 'permanent inhibit' programming system"), the "Sparks"

20  patent (which allegedly "discloses bulk erasing and loading of multiple arrays simultaneously"),

21  and the GB 145 patent (which allegedly "disclosed inhibiting the individual erasing of any

22  addressed cell verified to have reached its intended erase state while enabling further erasing in

23  parallel to other addressed cells not verified").  (4AC ¶¶ 56, 59, 64 & 67.)  Plaintiffs alleged that

24  each of these references were known to SanDisk and that the Disputed Patents would not have

25  issued if these references had been provided to the PTO.  (*Id.* ¶41.)

26

---

27  [3] 37 C.F.R. § 1.56 expressly provides that "information material to patentabililty" does not include information that is "cumulative to information already of record . . . in the application[.]" 37

28  C.F.R. § 1.56(a)-(b).

Plaintiffs cannot prove these allegations.  The Federal Circuit has repeatedly held that "'expert testimony regarding matters beyond the comprehension of laypersons is sometimes essential,' particularly in cases involving complex technology." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010) (quoting *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1369-70 (Fed. Cir. 2004)); *see also Perfect Web Techs., Inc. v. Info USA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009).  The alleged invalidity of complex technical patents is one area where the Court has held that expert testimony is "critical."

For example, in *Allergan*, the district court "declined to independently 'review the prior art references and weigh their import absent the guidance of an expert.'"  *Allergan, Inc. v. Barr Labs., Inc.*, 501 F. App'x 965, 971-72 (Fed. Cir. 2013) (unpublished).  The Federal Circuit affirmed:

> "[E]xpert testimony regarding matters beyond the comprehension of laypersons is sometimes essential,' particularly in cases involving complex technology."  Obviousness is one area in which expert testimony may be required.  In complex cases where invalidity on the grounds of obviousness is asserted, "expert testimony may be critical, for example, to establish the existence of certain features in the prior art or the existence (or lack thereof) of a motivation to combine references."

> The district court appears to have found this case to be "sufficiently complex to fall beyond [the] grasp of ordinary layperson[s]."  Indeed, this is not a case where "[t]he technology is simple," or where the references are "easily understandable without the need for expert explanatory testimony[.]"  Additionally, this is emphatically not a case where "[t]he factual inquiries underlying [the] determination of obviousness are not in material dispute."  Although in some cases, "the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony," the district court did not err in finding that common sense and logic were not sufficiently illuminating in this case to carry Barr and Sandoz's burden of proving obviousness.

*Id.* at 971-972 (citations omitted).

Similarly, in *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1347 (Fed. Cir. 2013), the defendant unsuccessfully argued invalidity based on the combination of the "Levine" patent and prior art references that "supposedly supply the missing element" claimed in the patented invention.  The Court noted that "[e]ven if these references do disclose this element, [the defendant] would still need to show that a person having ordinary skill in the art would have been motivated to combine one of these patents with Levine in order to achieve the claimed invention."  *Id.*  Nevertheless, the defendant "did not introduce any expert testimony about whether a skilled artisan would have been motivated to combine the various references to achieve the claimed

12

1 invention," even though it "bore the burden of proving this fact by clear and convincing

2 evidence[.]" *Id.*

3      On appeal, the defendant argued "that expert testimony was not necessary and that the

4 introduction of the references themselves was sufficient." The Federal Circuit rejected this

5 argument because "'expert testimony regarding matters beyond the comprehension of laypersons is

6 sometimes essential,' particularly in cases involving complex technology.'" *Id.* (quoting *Wyers*,

7 616 F.3d at 1240 n. 5).

> In this case, the technology was complex and the prior-art references were not easily
> understandable without expert testimony.... Expert testimony was required not only
> to explain what the prior-art references disclosed, but also to show that a person
> skilled in the art would have been motivated to combine them in order to achieve the
> claimed invention. [Defendant] provided no such expert testimony.

11 *Id.*; *see also Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008)

12 (holding the district court did not abuse its discretion "in requiring [the party asserting invalidity] to

13 present expert testimony in order to establish invalidity" because the technology was "sufficiently

14 complex to fall beyond the grasp of an ordinary layperson.").[4]

15      As in *Allergan*, *Alexsam* and *Proveris*, the Disputed Patents concern highly technical issues

16 relating to flash semiconductor technology and circuit design. This case is sufficiently complex to

17 "fall beyond the grasp of an ordinary layperson" so as to require expert testimony on the many

18 complicated issues involved in determining anticipation and obviousness. This includes the proper

19 construction of the claims of the Disputed Patents, the disclosures and teachings of the asserted

20 prior art, the differences between the claimed inventions and the prior art and application of the

21 prior art to the claims, and the motivation to combine the references to achieve the claimed

22 inventions, all of which must be viewed from the perspective of an artisan ordinarily skilled in

23 semiconductor technology and system design. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303,

24 1313 (Fed. Cir. 2005) (en banc) (patent claims are construed from the perspective of one of

---

25 [4] *See also Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) ("[T]o accept
26 confusing or generalized testimony as evidence of invalidity is improper. The risk is great that the
confusion or generality is the result, not of an inarticulate witness or complex subject matter, but of
27 a witness who is unable to provide the essential testimony."); *Hynix Semiconductor Inc. v. Rambus
Inc.*, 2009 WL 112834, at *6 (N.D. Cal. Jan. 16, 2009); *Immersion Corp. v. Sony Computer
28 Entertainment America, Inc.*, 2005 WL 680026, *5 (N.D. Cal. 2005).

SANDISK'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. CV 10-02787-SBA

1   ordinary skill in the art); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565,

2   1576 (Fed. Cir. 1991) (what a prior art reference discloses or teaches is determined from the

3   perspective of one of ordinary skill in the art); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19

4   (2007) (a party asserting obviousness in view of a combination of references has the burden to

5   show that an ordinary skilled person in the relevant field had a reason to combine the elements in

6   the manner claimed).

7       Plaintiffs elected to eschew claim construction and the aid of technical experts. (*See, e.g.*,

8   Chen. Decl. Ex. 25 at 7.) As a result they cannot, as a matter of law, carry their burden of proving

9   by clear and convincing evidence that the omitted references anticipate or render obvious any

10  claims of the Disputed Patents.

11      Plaintiffs also cannot prove that SanDisk intended to deceive the PTO. Plaintiffs allege that

12  SanDisk must have known of the references and their materiality because SanDisk's patent

13  prosecution firm maintained a searchable database of prior-art references cited in other

14  prosecutions that included the references. (4AC at ¶¶56-69.) Plaintiffs have no evidence, however,

15  that the inventors or the prosecuting attorneys searched the database during the prosecution of the

16  Disputed Patents, found any of the references, determined they were material, and then made a

17  deliberate decision not to disclose them to the PTO. To the contrary, Mr. Mehrotra has testified

18  that he was not aware of the references until after the '517 patent issued and SanDisk's patent

19  attorney denies having been cognizant of the references during the reexamination or '517 patent's

20  prosecution. (*See* Chen Decl. Ex. 17 at 5-7; Chen Decl. Ex. 45 at 9, 11-12, 14-19.) Accordingly,

21  no reasonable jury could find that a specific intent to deceive is "the single most reasonable

22  inference able to be drawn from the evidence." *Star Scientific*, 537 F.3d at 1366; *Therasense*, 649

23  F.3d at 1290-91.

24      **D.    Plaintiffs Cannot Establish The Other Elements Of Their Antitrust Claims**

25      The second barrier Plaintiffs must clear are the elements of their antitrust claims. *See*

26  *Walker Process Equip., Inc.*, 382 U.S. at 174. Plaintiffs cannot do so.

27          **1.    Plaintiffs Lack Both Article III And Antitrust Standing**

28      Antitrust plaintiffs must possess both Article III and antitrust standing. *See Am. Ad Mgmt.*,

14

1 │ *Inc. v. GTE Corp.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) ("A plaintiff who satisfies the

2 │ constitutional requirement of injury in fact is not necessarily a proper party to bring a private

3 │ antitrust action.").

4 │       "Article III standing requires proof of injury-in-fact, causation, and redressability."

5 │ *Gerlinger v. Amazon.com, Inc.*, 526 F.3d 1253 (9th Cir. 2008) (affirming summary judgment for

6 │ antitrust defendant where the plaintiff attempted to rely on allegations and academic theory to

7 │ establish causation and injury).

8 │       Antitrust standing requires proof of "antitrust injury," "which is to say injury of the type the

9 │ antitrust laws were intended to prevent and that flows from that which makes defendant's acts

10 │ unlawful." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997), *aff'd* 525 U.S. 299

11 │ (1999). "Antitrust injury requires the plaintiff to have suffered its injury in the market where

12 │ competition is being restrained." *Am. Ad Mgmt.*, 190 F.3d at 1057. Plaintiffs "whose injuries,

13 │ though flowing from that which makes the defendant's conduct unlawful, are experienced in

14 │ another market do not suffer antitrust injury." *Id.* Market participation requires that the products

15 │ or services offered by the plaintiff be reasonably interchangeable or have cross-elastic demand with

16 │ the products or services offered by the defendant. *See Bhan v. NME Hosps., Inc.*, 772 F.2d 1467,

17 │ 1470-71 (9th Cir. 1985) ("In analyzing whether nurse anesthetists and M.D. anesthesiologists

18 │ participate in the same market, the focus is upon the reasonable interchangeability of use or the

19 │ cross-elasticity of demand between the services provided by nurse anesthetists and by M.D.

20 │ anesthesiologists.").



23 │     (Chen Decl. Ex. 28 ("Sullivan

24 │ Tr.") at 47:12-48:13, 242:22-243:9; Dkt. 243 (denying Plaintiffs leave to file a modified 4AC

25 │ extending the damages period back to 1997).) Accordingly, they lack Article III and antitrust

26 │ standing because they were not injured.

27 │       All four Plaintiffs lack antitrust standing because they did not suffer "antitrust injury."

28 │ Plaintiffs originally alleged that they were direct purchasers in a single antitrust market that

1  encompassed both flash **chips** and flash **products.**  (Dkt. 1, 27, 143, 150.)  After more than four

2  years of litigation, Plaintiffs amended their complaint to allege—and ▮▮▮▮▮▮▮▮▮—that

3  flash **chips** and flash **products** are separate markets.  (4AC ¶29.)  This seismic shift in Plaintiffs'

4  allegations and subsequent testimony have revealed that ▮▮▮▮▮▮▮▮▮▮▮

5  

6  

7  (Sullivan Tr. at 392:8-393:19 (testifying that

8  

9  ); Chen Decl. Ex. 41 at 4:17-20, 18:19-19:15, 37:16-21; Ex. 42 at 9:2-23, 13:14-

10  14:2; Ex. 43 at 5:1-23, 8:4-14, 66:10-21; Ex. 44 at 7:24-9:6, 77:14-78:2.)  Accordingly, Plaintiffs

11  lack antitrust standing.  *See Universal Grading Serv. v. eBay, Inc.*, 563 F. App'x 571, 572 (9th Cir.

12  2014) (unpublished) (dismissing Section 2 claims because plaintiff did not participate in "[t]he only

13  market in which [defendant] was alleged to have a monopoly"); *Am. Ad Mgmt.*, 190 F.3d at 1057

14  (explaining that "[p]arties whose injuries, though flowing from that which makes the defendant's

15  conduct unlawful, are experienced in another market do not suffer antitrust injury").)

16  

17  (Sullivan Tr. at 383:11-21.)

18  **2.  Plaintiffs Cannot Prove Causal Antirust Injury And Damages**

19  Private antitrust plaintiffs seeking damages must prove a causal antitrust injury and

20  damages.  *See* 15 U.S.C. § 15(a); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.

21  1995) ("[C]ausal antitrust injury . . . is an element of all antitrust suits brought by private parties.");

22  *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992) (affirming summary

23  judgment for defendant because plaintiff had "no proper proof of damages at all").[5]  "The greater

24  number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."

25  

26  [5] Section 16 of the Clayton Act provides for a private right of action seeking injunctive relief.  15
U.S.C. § 26.  Plaintiffs cannot, however, obtain injunctive relief because they cannot demonstrate a
threat of future harm: (1) the Disputed Patents are long expired, and (2) Dr. Sullivan calculates no

27  damages beyond their expiration.  *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past
exposure to illegal conduct does not in itself show a present case or controversy regarding

28  injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

16

1  *Twin Cities Bakery Workers Health & Wellfare Fund v. Biovail, Corp.*, 2005 WL 3675999, at *5

2  (D.D.C. Mar. 31, 2005) (granting summary judgment for antitrust defendant where plaintiffs

3  lacked evidence supporting links in their chain of causation).

4       Plaintiffs' causation theory is based on a least four links, none of which is supported by any

5  admissible evidence:

6       **Link 1**: SanDisk enforced the Disputed Patents to extract royalties from rival flash
        memory *chip* manufacturers on their sales of flash *chips* that it would not have collected
7       but-for the Disputed Patents.

8       **Link 2**: The rival flash *chip* manufacturers passed through these royalties to flash memory
        *product* manufacturers (directly or through intermediaries) by raising their prices for flash
9       memory *chips*.

10      **Link 3**: Flash memory *product* manufacturers, in turn, passed through some of the
        royalties by raising their prices for flash memory *products*.
11

12      **Link 4**: *SanDisk* responded to the increased flash memory product prices of rival flash
        memory product manufacturers by raising its flash memory product prices, which resulted
        in the putative class paying supracompetitive prices to SanDisk.
13

14      As to **Link 1**, Plaintiffs' only evidence is Dr. Sullivan's opinion that



15

16

17  (Sullivan 2d Rep. ¶¶91, 110.)  His opinion, however, cannot establish **Link 1** because it is

18  unsupported by any competent evidence.  *See Rebel Oil*, 51 F.3d at 1436 ("When an expert opinion

19  is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record

20  facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.");

21  *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 672 (D.C. Cir. 1996) ("court need not accept

22  alleged causal chain if each link is not supported by competent evidence").

23      Dr. Sullivan's opinion is not based on any economic analysis, much less a recognized and

24  reliable methodology.  (Chen Decl. Ex. 32 ("Keeley Rep.") ¶¶74-89; Ex. 33 ("Keeley 2d Rep.")

25  ¶¶10-14 & n.16.)  Nor is his opinion based on any evidence as to what SanDisk's licensees would

26  have done because Plaintiffs did not seek discovery from those third parties.  In other words, Dr.

27  Sullivan rendered an opinion that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

28  ▆▆▆▆▆▆▆▆▆▆▆▆  without:  (1) speaking with any SanDisk licensee, (2) Plaintiffs

17

1  deposing any SanDisk licensee, or (3) determining whether any licensee practiced the Disputed

2  Patents or the other patents in SanDisk's portfolio.  Indeed, Dr. Sullivan inexplicably testified that

3  ████████████████████████████████████████████████████████████████████████

4  (Sullivan Tr. at 71:21-72:9, 212:6-23).  "[E]xpert testimony without . . . a factual foundation cannot

5  defeat a motion for summary judgment." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F.

6  Supp. 2d 571, 579 (S.D.N.Y. 1999), *aff'd* 257 F.3d 256 (2d Cir. 2001).

7          Dr. Sullivan's opinion is also fatally flawed because he fails to disaggregate royalties

8  collected on the '338 patent from royalties collected on the other patents in the portfolio that

9  SanDisk licensed to NAND flash chip manufacturers.  *See MCI Commc'ns Corp. v. AT&T Co.*, 708

10  F.2d 1081, 1162 (7th Cir 1982) ("When a plaintiff improperly attributes all losses to a defendant's

11  illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to

12  make a reasonable and principled estimate of the amount of damage.  This is precisely the type of

13  'speculation or guesswork' not permitted for antitrust jury verdicts."); *City of Vernon*, 955 F.2d at

14  1371-73.  There is no dispute that ████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████ (Sullivan Tr. at 285:12-

17  286:4; Chen Decl. Ex. 32 §§ 4-5.)  Nevertheless, Dr. Sullivan ████████████████

18  ████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████. (Sullivan Tr. at 286:5-288:9; Sullivan 2d Rep. at K-10.)  In doing so, Dr. Sullivan mistakes

21  his flawed opinion as to the cause of the licenses for an opinion on causal antitrust injury. Dr.

22  Sullivan failed to perform any economic analysis to determine whether the parties would have

23  reached different monetary terms for a license to just the '338 patent.

24          As to **Link 2**, Plaintiffs have no evidence that any flash memory chip manufacturer raised

25  its prices as a result of paying any royalties to SanDisk.  Plaintiffs have not (1) deposed any flash

26  memory chip manufacturer that paid royalties to SanDisk, (2) obtained accounting data from any

27  flash memory chip manufacturer that paid royalties to SanDisk, or (3) disclosed the identity of any

28

SANDISK'S MOTION FOR SUMMARY JUDGMENT        CASE NO.  CV 10-02787-SBA

1 | *fact* witness who will be testifying that a flash chip manufacturer even considered royalties it paid
2 | to SanDisk when setting flash chip prices.

3 |     Plaintiffs rely instead on Dr. Sullivan's untested hypothesis that 
4 | ████████████████████████████████████████████████████████ (Sullivan Tr.
5 | at 342:24-343:19; Sullivan 2d Rep. ¶¶15-16.)  Plaintiffs may not, however, avoid summary
6 | judgment on the basis of an expert's unsupported conclusion. *See Virgin,* 69 F. Supp. 2d at 579-80
7 | (finding expert's conclusion that incentive agreements resulted in increased British Airways flights
8 | inadequate where there was no evidence of increased flights); *Rebel Oil,* 51 F.3d at 1436 ("Expert
9 | testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.").
10 | This is particularly true where, as here, the record evidence is contrary to the expert's opinion. Dr.
11 | Sullivan's opinion that ████████████████████████████ is contrary to the data in his report
12 | showing that ████████████████████████████████████████████████
13 | ███████████████████ (Sullivan 2d Rep. at Att. M-14 ███████████
14 | ███████████████████████████████████████████████████████████
15 | ███████████████████████████████████████████████████); Keeley 2d
16 | Rep. Ex. 2.)

17 |     As to **Links 3 and 4,** Plaintiffs have no admissible evidence that (1) flash product
18 | manufacturers raised their prices on flash products as a result of increased flash chip prices, or
19 | (2) that SanDisk responded to increased competitor prices on flash products by raising its prices on
20 | flash products.  (Dkts. 259, 267; Keeley Rep. ¶¶111-32; Keeley 2d Rep. ¶¶23-36.)  Even if his
21 | testimony were admissible, Dr. Sullivan's regression does not—and cannot be used to—show that
22 | (1) flash product manufacturers charged higher prices on flash products, and (2) SanDisk
23 | responded by raising its own prices.  (*Id.*)

24 |         **3.        Plaintiffs Cannot Prove SanDisk Had Market Power In Any Market**
25 |     Plaintiffs' monopolization claim requires proof that SanDisk possessed monopoly power in
26 | the relevant market. *See Forsyth,* 114 F.3d at 1475. Plaintiffs' attempted monopolization claim
27 | requires proof that there was a dangerous probability that SanDisk would obtain monopoly power

28 |

19

1  in a relevant market. *Id.* at 1477. Plaintiffs cannot, however, prove that SanDisk possessed market

2  power, or a dangerous probability of obtaining market power, in any relevant market.

3             **(a)**      **<u>Plaintiffs Cannot Prove Market Power With Indirect Evidence</u>**

4          To prove market power through indirect evidence, "a plaintiff must: (1) define the relevant

5  market, (2) show that the defendant owns a dominant share of that market, and (3) show that there

6  are significant barriers to entry and show that existing competitors lack the capacity to increase

7  their output in the short run." *Rebel Oil Co.*, 51 F.3d at 1434. Plaintiffs cannot do so.

8             **(i)**      **<u>Plaintiffs Failed To Define Any Relevant Market</u>**

9          "[T]o establish monopolization or attempt to monopolize under § 2 of the Sherman Act, it

10  [is] necessary to appraise the exclusionary power of the illegal . . . claim in terms of the relevant

11  market for the product involved." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56

12  (1993) (citing *Walker Process*, 382 U.S. at 177). "'[D]efining the relevant market is indispensable

13  to a monopolization claim.'" *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484,

14  1491 (9th Cir. 1991) (citation omitted); *see also Spectrum Sports*, 506 U.S. at 457 ("[I]t is beyond

15  doubt that [a monopolization claim] requires proof of market power in a relevant market."),

16  Accordingly, summary judgment is warranted when a plaintiff fails to present evidence sufficient

17  to define the relevant market. *See Morgan, Strand*, 924 F.2d at 1491.

18          In an attempt to meet their burden regarding market definition, Plaintiffs rely on the

19  testimony of Dr. Sullivan, who opines that ████████████████████████████████

20  ████████████████████████████████████. (Sullivan 2d Rep. ¶¶67-68.)[6] But as

21  detailed in SanDisk's Motion to Exclude Dr. Sullivan's Second Report, Dr. Sullivan's market

22  definition opinions are inadmissible because he fails to properly employ his chosen methodology:

23  the small but significant and non-transitory increase in price ("SSNIP") test. Because Dr. Sullivan

24  failed to apply the SSNIP test properly, his market definition opinions should be excluded, and

25  SanDisk should be granted summary judgment. *See, e.g., Ky. Speedway, LLC v. Nat'l Ass'n of*

26

27  _____

[6] The 4AC alleges a sixth "wireless memory" flash product market (4AC ¶29), but Dr. Sullivan offers no opinion that such a market exists.

28

SANDISK'S MOTION FOR SUMMARY JUDGMENT           CASE NO. CV 10-02787-SBA

1  *Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918-19, 921 (6th Cir. 2009) (affirming summary

2  judgment where expert did not properly perform the SSNIP test); *In re Live Concert Antitrust*

3  *Litig.*, 863 F. Supp. 2d 966, 987, 1000 (C.D. Cal. 2012) (granting summary judgment where expert

4  "did not employ the iterative approach called for under the SSNIP methodology").

5  **(ii)   SanDisk's Alleged Market Shares Are Too Low**

6  Plaintiffs cannot prove that SanDisk possessed market power in any flash *chip* or flash

7  *product* market. As to the flash *product* markets, Dr. Sullivan recently admitted at his

8  deposition—contrary to his written reports—that ▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮ (Sullivan Tr. at

10  392:6-393:19, 418:12-419:11). SanDisk is, therefore, entitled to summary judgment on Plaintiffs'

11  claims with respect to the flash products markets. *See, e.g., Colsa Corp. v. Martin Marietta Servs.,*

12  *Inc.*, 133 F.3d 853, 855 n. 4 (11th Cir. 1998) (holding that a showing of market power must be

13  based on expert testimony).

14  Plaintiffs also cannot prove that SanDisk's market share in either the flash *chip* or flash

15  *product* market came close to the threshold level required to make out a prima facie case of market

16  power. "Courts generally require a 65% market share to establish a prima facie case of market

17  power." *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997);

18  *see also Rebel Oil*, 51 F.3d at 1438 ("[N]umerous cases hold that a market share of less than 50

19  percent is presumptively insufficient to establish market power."). SanDisk's market shares fall

20  well below this threshold. With regard to the putative flash chip market, Dr. Sullivan determined

21  that ▮▮▮▮▮▮▮▮▮▮ (Sullivan

22  Rep. ¶75), and ▮▮▮▮▮▮▮▮.

23  (*Id.* Att. I-5.) According to Dr. Sullivan, ▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮. (*Id.* Att. I-7.)[7]



27  _____

[7] Much of Dr. Sullivan's share data—including the only data he provides for the putative embedded
28  storage market—falls outside the relevant period.

21

1   Thus, Plaintiffs cannot meet their burden to establish that SanDisk possessed a dominant share of

2   any relevant market for flash chips or flash products.

3                **(iii)**   **Plaintiffs Cannot Prove Barriers To Entry Or Expansion**

4        Plaintiffs also cannot meet their burden to prove the existence of barriers both to *entry* and

5   *expansion* in any alleged market.  As to barriers to *expansion (i.e.*, impediments that prevent firms

6   from increasing output in the short run), neither Plaintiffs nor Dr. Sullivan even purport to provide

7   evidence that such barriers existed in any relevant market.  This failure alone prevents Plaintiffs

8   from establishing market power via indirect evidence.  *See, e.g., Rebel Oil*, 51 F.3d at 1443

9   (affirming summary judgment for antitrust defendant because "[a]lthough there is a genuine issue

10   regarding market share and entry barriers, there appears to be no genuine issue regarding the ability

11   of [defendant's] existing competitors to increase their output"); *Townshend v. Rockwell Int'l Corp.*,

12   55 U.S.P.Q.2d 1011, 1021 (N.D. Cal. 2000) (Armstrong, J.) (dismissing Section 2 claim because

13   plaintiff "has not alleged facts to show that competitors are unable to expand output").

14        Plaintiffs similarly have no evidence of barriers to *entry*.  Barriers to entry are "either

15   'additional long-run costs that were not incurred by incumbent firms but must be incurred by new

16   entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn

17   monopoly returns.'"  *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993)

18   (citation omitted).  While Dr. Sullivan claims that

19

20   (Sullivan 2d Rep. ¶¶80-81), he performs no analysis

21   of whether any of these purported barriers imposed higher costs on new entrants than the costs

22   incurred by firms that already competed in any of the putative relevant markets.  For example, Dr.

23   Sullivan provides no evidence that new entrants needed to expend more on research and

24   development than SanDisk in order to enter any of the alleged relevant markets.  (Keeley 2d Rep.

25   ¶¶56-57.)  Because Plaintiffs have no evidence that new entrants faced higher costs than incumbent

26   firms, they cannot create a fact dispute regarding the existence of barriers to entry.  *See E. Portland*

27   *Imaging Ctr., P.C. v. Providence Health System-Oregon*, 280 F. App'x 584, 586 (9th Cir. 2008)

28   (unpublished) (no genuine dispute regarding the existence of barriers where plaintiffs failed to

22

1    provide "evidence that new entrants face long-run costs that were not or will not be incurred by

2    incumbent providers").

3        Moreover, evidence of entry and expansion by SanDisk's competitors establishes the

4    absence of significant barriers to entry or expansion in the putative relevant markets.  In the alleged

5    flash *chip* market, Dr. Sullivan's own analysis reveals that █████████████████████████

6    █████████████████████████████████████████████████████████████████████████████████

7    ████████████.  (Keeley 2d Rep. ¶51 & Ex. 3 (citing Sullivan Rep. Att. I-5).)  Dr. Sullivan's

8    data indicate that ████████████████████████████████████████████████████████████████

9    ██████████████████████  (*Id.*)  Some of these SanDisk competitors expanded output rapidly.

10   For example, ████████████████████████████████████████████████████████ (*id.*),

11   and ████████████████████████████████████████████ (*Id.* ¶58.)  With regard to flash

12   *products*, Dr. Keeley's analysis highlights ████████████████████████████████████████

13   █████████████████████████████████ (*Id.* ¶¶65-70.)  For example, in the putative USB flash

14   drive market, █████████████████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████████████████████████████████

16   ████████████ (*Id.* ¶¶66-67.)[8]  With regard to media players, ███████████████████████

17   ████████████████████████████████████████ (*Id.* ¶70.)

18       Accordingly, Plaintiffs cannot establish market power through indirect evidence because

19   they cannot prove the existence of barriers to entry or expansion in any putative market.

20              **(b)**    **Plaintiffs Cannot Prove Market Power Through Direct Evidence**

21       To establish market power through "direct evidence," a plaintiff must prove ***both*** (i)

22   restricted output, ***and*** (ii) supracompetitive pricing.  *See Rebel Oil*, 51 F.3d at 1434; *see also*

23   *Forsyth*, 114 F.3d at 1476 ("The plaintiffs submitted evidence that [defendant] routinely charged

24   higher prices than other hospitals while reaping high profits.  With no accompanying showing of

25   _____

26   [8] Indeed, in *SanDisk Corp. v. Kingston Technology Co.*, 863 F. Supp. 2d 815 (W.D. Wis. 2012), the
     district court found that with regard to USB flash drives, "[i]mpediments to entry are few:  the

27   percentage of the market held by small firms with less than a 1% market share increased from 16 to
     35% between 2006 and 2010 and the percentage held by private labels sales doubled from 5 to

28   10%."  *Id.* at 820.

1    restricted output, however, the plaintiffs failed to present direct evidence of market power."). Proof

2    of restricted output requires evidence that the defendant "restrict[ed] its own, and hence the

3    market's, output." *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 896 (N.D. Cal.

4    2012), *vacated in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012). Proof of

5    supracompetitive prices requires a comparison between the defendant's prices and margins relative

6    to those of its rivals. *See id.* at 897 (holding Mayer failed to provide evidence of supracompetitive

7    pricing by C&D, where Mayer did "not provide evidence as to its own or other rivals' comparative

8    margins," and Mayer's prices were "even higher" than C&D's prices); *Carpenter Tech. Corp.* v.

9    *Allegheny Techs. Inc.*, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011) (*Walker Process*

10   plaintiff could not prove that defendant's prices were supracompetitive because "the profits

11   [plaintiff] claims reflect supracompetitive prices were not drastically above its own profits for the

12   same product").

13              (i)    **Plaintiffs Cannot Prove Restricted Output And**
                       **Supracompetitive Pricing In Any Market**
14

15          Plaintiffs cannot prove restricted output and supracompetitive prices in any alleged market.

16   As to flash chips, Dr. Sullivan provides *no analysis* of output or prices. While he explains that

17

18                                                  (Sullivan 2d Rep. ¶36), he fails to analyze

19   marketwide output or pricing and instead bases his market power opinion solely on

20                                                  (*id.* ¶42), possibly because such

21   analysis would have been futile. The output of flash chips expanded rapidly between 1997 and

22   2013, and prices declined dramatically. (Keeley 2d Rep. ¶50.) Indeed, Dr. Sullivan's own data

23   illustrate                                              (*Id.* & Ex. 3.)

24          As to flash products, Dr. Sullivan admitted at his deposition that

25                                                  . In any event, his regression

26   model, which he claims

27   (Sullivan 2d Rep. ¶43(c)), is inadmissible. (Dkts. 259, 267.) Even if his model were admissible, it

28   does not provide evidence of restricted marketwide output and supracompetitive prices. The model

                                                24

1   does not show that SanDisk restricted its own output, let alone marketwide output for any flash

2   product.  In addition, the model cannot establish supracompetitive pricing because it does not

3   analyze SanDisk's margins or the prices or margins of any SanDisk competitor.

4        Dr. Sullivan provides no basis to conclude that output would have been even higher, or

5   prices even lower, but for the alleged misconduct.

6               **(ii)**    **Plaintiffs Failed To Define A Relevant Market**

7        Plaintiffs cannot establish market power through direct evidence without defining the

8   relevant markets in which SanDisk allegedly exercised market power because "[w]ithout a

9   definition of th[e] market there is no way to measure [the defendant's] ability to lessen or destroy

10  competition." *Walker Process*, 382 U.S. at 177.  Accordingly, courts routinely dismiss *Walker*

11  *Process* claims when the plaintiff fails to define a relevant market.  *See, e.g.*, *Delano Farms Co. v.*

12  *Cal. Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011) (affirming dismissal of *Walker*

13  *Process* claim because plaintiff failed to adequately define the relevant market); *Carpenter Tech.*,

14  2011 WL 4528303, at *11 (plaintiff could not establish market power through indirect or direct

15  evidence because of its "failure to proffer sufficient evidence in support of its relevant market

16  definition"); *Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at *9 (C.D. Cal. Oct. 8, 2009)

17  (granting summary judgment because plaintiff failed to define the relevant market).

18       Here, as discussed above, Plaintiffs have failed to properly define any market.  Plaintiffs

19  cannot, therefore, establish market power through direct evidence.

20                            **CONCLUSION**

21       For the foregoing reasons, SanDisk respectfully requests that the Court grant SanDisk's

22  motion for summary judgment and dismiss the 4AC in its entirety.  Alternatively, SanDisk requests

23  that the Court grant partial summary judgment as to those facts that are not genuinely in dispute.

24  DATED:  February 3, 2015        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

25

26            By:  _____/s/ *James P. Schaefer*_____

                     JAMES P. SCHAEFER

27                  Attorneys for Defendant,

28                  SANDISK CORPORATION